IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **Liz Gomez, Marissa Sanchez,** | § | |
| **Felecia McKinney,** and **Jacquelyn Aluotto** | § | |
| | § | |
| *Plaintiffs* | § | |
| | § | |
| v. | § | Civil Action No._____ |
| | § | |
| **Harris County, Texas**; | § | (Jury Demanded) |
| **Alan Rosen**, *in his individual capacity*, | § | |
| **Chris Gore**, *in his individual capacity*, | § | |
| **Shane Rigdon**, *in his individual capacity* | § | |
| | § | |
| *Defendants* | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

For their Complaint, Plaintiffs, by and through their attorneys, allege as follows:

### PRELIMINARY STATEMENT

1.      Under the supervision of Constable Alan Rosen at the Harris County Constable's Office, Precinct One, young female deputies were handpicked for "undercover operations" under the guise of legitimate police work were molested and traumatized by their intoxicated male commanding officers for their own sexual gratification. What began as an idea for "bachelor party" prostitution stings soon grew into a booze-fueled playground for sexual exploitation in which young, untrained deputies were subject to disgusting abuse. Both Constable Rosen and the Harris County District Attorney's Office have known about this abuse for months, but they refused to take any action and rebuffed

1

anyone who complained.  Constable Alan Rosen attended at least one of these 'parties' personally.  Three of the young deputies spoke up about their abuse to their supervisors at the Constable's Office, including Constable Rosen's chief of staff, but they were ridiculed by their commanders, retaliated against by their abusers, and quietly reassigned to less prestigious duties.

2.      A human trafficking advocate employed by Constable Rosen's office also vigorously complained to her chain of command, Constable Rosen, and the District Attorney's Office, all of whom either rebuffed or outright ignored her. She finally spoke to the Internal Affairs division of the Constable's Office, where she gave an extensive interview concerning the outrageous abuse of these young officers. On the very next day, she was fired.

3.      While self-describing as a "second-chance guy,"[1] Constable Rosen and The County have shown that they are deliberately indifferent to the abuse suffered by these brave women and others.   As such, this lawsuit has become necessary to bring accountability for the horrific ordeal of these young law enforcement deputies and ensure that their experience is never repeated.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 because this action involves claims arising under federal law, including under the Constitution of

---

[1] *Pct. 1 Sergeant Investigated for Child Sex Abuse Fired From Harris County Sheriff's Office in 2013*, (https://www.click2houston.com/news/local/2021/05/22/pct-1-sergeant-investigated-for-child-sex-abuse-fired-from-harris-county-sheriffs-office-in-2013/)

the United States of America, enforceable through 42 U.S.C. § 1983 and under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, et seq.).

5.      Venue is proper under 28 U.S.C § 1391(b)(1) and (d) because the Defendants Harris County, Gore, and Rigdon reside in this district, Defendant Harris County has its principal place of business in this judicial district, and all of the acts and occurrence that give rise to this lawsuit took place in this judicial district.

## THE PARTIES

6.      Plaintiffs Liz Gomez, Marissa Sanchez, and Felecia McKinney ("The Deputy Plaintiffs") are former and current Deputies of the Harris County Constable's Office. They are each citizens of Texas.

7.      Plaintiff Jacquelyn Aluotto ("The Whistleblower Plaintiff") is a human trafficking advocate formerly employed by Harris County to work with the Human Trafficking Unit at the Harris County Constable's Office, Precinct 1. She is a citizen of Texas.

8.      Defendant Alan Rosen is the Harris County Constable for Precinct One. He is a citizen of Texas. At all material times, Defendant Rosen was acting under color of state law.  At all material times, Defendant Rosen was acting in his official capacity.

9.      Defendant Chris Gore is Assistant Chief at the Harris County Constable's Office, Precinct One. He is a citizen of Texas. At all material times, Defendant Gore was acting under color of state law.  Defendant Gore was further acting in his managerial capacity as an official and executive within the Harris County Constable's Office, Precinct One.

10.     Defendant Shane Rigdon is a Lieutenant at the Harris County Constable's Office, Precinct One. He is a citizen of Texas. At all material times, Defendant Rigdon was acting under color of state law.  Defendant Rigdon was further acting in his managerial capacity as an official and executive within the Harris County Constable's Office, Precinct One.

11.     Defendant Harris County is a political subdivision of the State of Texas, organized and existing by virtue of the laws of Texas. The Harris County Constable's Office, Precinct One was at all material times a Harris County agency through which Harris County fulfills its policing functions.

## FACTS

### A.     Alan Rosen's Human Trafficking Unit

12.     Harris County Constable's Office, Precinct One ("HCCO-1") employs a grant-funded Human Trafficking Unit. The unit is an opportunity for notoriety and media attention for this Constable's office.  The Human Trafficking Unit is overseen by Constable Alan Rosen, who is the final policymaker of the entity. Field operations are managed by Asst. Chief Chris Gore and Lieutenant Shane Rigdon.

13.     In order to make arrests in human-trafficking matters, undercover operations and stings are common in which a male undercover officer will pose as a "John" in order to get a trafficked sex worker to agree to an illegal act and then make the arrest. These young women are truly victims of their sex traffic business handlers, and the intent of this federally funded unit is to encourage these victims to identify the individuals at the heart

of the illegal operation and to stop the business at its source by further arrests and prosecutions.

14.     Chief Gore, with the approval of Constable Rosen, decided to change the format of the HCCO-1 operations to "bachelor party" stings. In Gore's "bachelor party" operations, the division would set up surveillance in a hotel room or suite, and both male and female deputies would be present in an undercover capacity in a party-like atmosphere where the female deputies would pose as other prostitutes present for the same purpose. Ideally, this would entice any prostitutes called to the location to feel more comfortable in quickly agreeing to sex in exchange for a fee, and an arrest could be made.  This type of operation did not result in more productivity; it did provide an opportunity though for the male deputies to have more fun under the guise of actual policework.  Each and every one of these "bachelor party" stings were county-sanctioned operations. Despite being "in a legal gray area," as Chief Gore would refer to the operations when discussing them with his underlings, they were done in accordance with department policy, set and approved by Rosen.

15.     In fact, when launching the "bachelor party" stings, Constable Rosen personally visited the sting and fully approved Chief Gore's operation and personnel.

16.     Given the unusual, sensitive, dangerous, and potentially traumatic nature of the operations, proper police procedure dictates that deputies with undercover training would be given these roles. However, HCCO-1 's leadership had different plans.

17.     Chief Gore hand-picked female deputies for these undercover operations without regard to any undercover training they might have. Indeed, none of those selected

were trained in this capacity. Rather, Chief Gore chose his partners based on his personal taste in women - young, attractive, and Latina.

## B.    Liz Gomez: The Recruit

18.    Liz Gomez was an inexperienced Deputy Officer that was hand-picked by Chief Gore for these operations in 2019.

19.    Gomez had no training in undercover operations, nor any training to prepare her to participate in sexually-charged "bachelor party" stings.

20.    Gomez was continuously subjected to sexual harassment, unwarranted touching, unwanted kissing, molestation, and sexual ridicule during her work on the Human Trafficking Unit.

21.    Chief Gore instructed Gomez to purchase new and revealing clothing and send images via text to Chief Gore while shopping.   Gore would relay the message "that's not slutty enough" while Gomez was trying on the clothing at the store, and was ordered to purchase something more provocative.

22.    Gomez was then ordered to try on the dresses for Gore in his office.

23.    Gomez was ordered to accompany Chief Gore to an adult sex shop where he would "pick out some props" and "work on chemistry" with her. After picking up a product labeled "cock sleeve," Chief Gore commented to the young female deputy "oh I bet you would like this." He also instructed Gomez to purchase dildos and to "pick out the ones you would personally prefer." These sex toys were paid for with County funds.  This trip to the sex shop was also the first of several instances where Chief Gore told Liz Gomez she was not allowed to work with any other male deputies…she was "his."

24.     While Chief Chris Gore was present at the "bachelor party" stings in an undercover capacity, with his chosen female "undercover" to molest, he specifically instructed all deputies ***not*** to include his name when listing those present in their offense reports.  This instruction was given despite the fact that quite obviously Chief Gore would be an eyewitness to the conduct giving rise to a potential arrest, in violation of criminal discovery statutes.

25.     Female deputies were ordered to purchase and wear revealing clothing for these operations. Each of them was ordered that during these operations "to maintain cover" Chief Gore would be lying down on top of them, fondling their breasts and bodies. They were never warned, however, that during this conduct Chief Gore would be wearing only boxer shorts, fully aroused, drunk, kissing and licking their bodies, and giddy after every sting.  Each time Chief Gore molested Liz Gomez during these County-sanctioned operations, she would be fighting back the urge to break down in tears.

26.     Alcohol was purchased with HCCO-1 petty cash and consumed in abundance. The male supervisors would continually pressure female deputies to drink. Gore would tell the female deputies to "drink up," "get loose," and that it was time to "start the party."  The "stings" were indeed more of a party atmosphere than an actual operation.

27.     Despite a formal policy regarding alcohol consumption while undercover, it was the widespread custom and practice of the unit to consume large amounts of alcohol during the operations, as approved by Constable Rosen. Furthermore, the female deputies were pressured by Gore and Rigdon to take shots of alcohol because he "wants us to bond"

and to "loosen up and have a good time." This involved drinking to excess, and at least some male deputies being too drunk to drive home after the operations were over.

28.     There were several cameras set up for viewing in the surveillance room for the operation.  Cameras were set up so that the entire room was viewable.  Chief Gore, however, instructed the surveillance teams to ensure that none of the "party scenes" were caught on the footage that would be provided to the District Attorney's Office for any arrests.

29.     Lieutenant Shane Rigdon would review all surveillance of the operations the day following the evening stings and delete footage that he declared "lacked evidentiary value" before providing the evidence to the District Attorney's Office, again in violation of criminal discovery statutes.

30.     Following her first two operations, Gomez asked to be removed from the undercover team. After ridicule and denigration, her request was reluctantly granted, and she was subjected to continuous harassment from her superiors for "not having what it takes."

## C.    Marissa Sanchez: The Replacement

31.     When Liz Gomez was removed from the team, Marissa Sanchez, a rookie Deputy, was specifically handpicked by Chief Gore for the open position of "his girl."

32.     Sanchez was an inexperienced Deputy with no training in undercover operations, and no training to prepare her for these sexually-charged stings.  Chief Gore instructed her that she would likewise be "his girl."

33.     Sanchez was continuously subjected to sexual harassment, unwarranted touching, unwanted kissing, molestation, and sexual ridicule during her work on the Human Trafficking Unit.

34.     Sanchez was ordered to participate in the "bachelor party" stings in an undercover capacity.

35.     Sanchez was not provided with any training for her duties. She was simply instructed, as was Liz Gomez, to wear revealing clothing, simulate sexual activity, and allow Chief Gore to kiss, touch, and fondle her.

36.     Sanchez was instructed by Chief Gore that she would be "his girl" and not to work with any other male deputies.

37.     At the onset of her first operation before any suspects arrived, Sanchez's training consisted of being in a room with her male superiors while dressed in revealing clothing and being told to "show us what you got." She was then told that meant for her to start giving her male superior a lap dance.

38.     Like Gomez, Sanchez was told "if the scenario calls for it, you may need to take off your clothes." As the first suspects arrived and the sting began, Chief Gore immediately took off Sanchez's bra without warning and for no real reason. He then threw her bra across the room. This conduct would become his routine at the beginning of every single operation.  While her breasts and naked body were exposed due to Chief Gore's actions, he would continuously laugh, even after the undercover operation ended.

39.     Chief Gore would maneuver his body on top or under Sanchez, where she could feel his arousal. Chief Gore also would immediately begin kissing and licking

Sanchez's neck and chest. Chief Gore was intoxicated during these assaults due to the shots of hard liquor he insisted all undercovers consume before and during operations and the cases of beer the male deputies consumed throughout the operations.

40.     Once the suspects were arrested, Chief Gore would make it a point to walk slowly to find and retrieve Sanchez's bra and would continuously make inappropriate comments about her naked body. This was done after the arrests had been made, and no possible police function served.

41.     Sanchez would then face inappropriate comments and treatment at the Constable stationhouse between stings from her male superiors, including Chief Gore and Lt. Shane Rigdon commenting on how her body looked naked.

42.     Chief Gore would also make inappropriate comments about Sanchez's boyfriend and personal relationship. These comments were the offspring of Chief Gore's personal jealousy, and Sanchez was retaliated against as a result of this jealousy.

43.     Retaliation included verbal harassment, hostile work environment, and the direct threat "we are doing another operation next week and every week." Chief Gore was going to get what he wanted, regardless of how.

44.     Sanchez finally built up the courage to report this outrageous conduct to Constable Alan Rosen. After making an appointment to do so, she was stopped outside the office by his Chief of Staff, Erica Davis, who advised Sanchez would be meeting with her instead. After disclosing the horror she was forced to go through at the behest of her commanding officer, Sanchez was handed her transfer papers out of the unit to less prestigious duties. No action was taken against Chief Gore or Lieutenant Rigdon.

45.     That very evening, as Sanchez walked to her car in tears and disbelief, Chief Gore and Alan Rosen were seen walking out of the building, laughing and giving each other a hug goodbye.

**D.     Felecia McKinney: The Sacrificial Lamb**

46.     Felecia McKinney was likewise a young Deputy, also given no undercover training, selected by Chief Gore for the Human Trafficking Unit.

47.     Like Liz Gomez and Marissa Sanchez, Felecia McKinney had no applicable training in undercover operations or any training to prepare them on the sexually-charged stings.

48.     McKinney was continuously subjected to sexual harassment and sexual ridicule during her work on the Human Trafficking Unit.

49.     McKinney was ordered to participate in the "bachelor party" stings in an undercover capacity.

50.     McKinney was ordered by her superior officers to wear revealing clothing and ordered to expose herself during operations 'to maintain cover.'

51.     In the course of obeying her Chief's orders, it was impossible to maintain any semblance of modesty and was regularly forced to expose herself in front of her colleagues.

52.     Each "bachelor party" sting began with the male supervisors pressuring the females to take shots of hard alcohol "to loosen up" and "have a good time."

53.     Despite her and other female deputies protesting and objecting to this assignment and operation, the male deputies in supervisory roles instructed Jane Does 1,

2, and 3 that if the women wanted to be in the human trafficking division, then they would need to comply with their unwanted sexual contact, sexual harassment, and sexual ridicule.

54.     The Deputy Plaintiffs were told they would need to be willing to do "whatever it takes to make the arrest."  Despite that instruction, it was well understood in the unit that the "bachelor parties" had nothing to do with arrests, and merely focused Chief Gore and Lt. Rigdon having a good time. On one operation, Chief Gore was photographed in his underwear, drink in hand, watching two other deputies wrestle and play with a 'dildo' trying to shove it in each others' pants.

55.     While McKinney's experience in the undercover bachelor party stings was gruesome and gut-wrenching in its own right, her most horrifying experience came from yet another HCCO-1 operation overseen and approved by Constable Alan Rosen.

56.     On the morning of August 22nd, 2019, McKinney and another deputy were ordered to drop everything they were doing to come to Chief Gore's office for a meeting. In the meeting, they were told that Alan Rosen's Chief of Staff was sexually assaulted at a massage parlor and that Alan Rosen wanted HCCO-1 Human Trafficking Unit to send undercover females into the establishment.

57.     McKinney was ordered to enter the parlor in an undercover capacity *and wait to be sexually assaulted* to give the raid signal.  When McKinney asked why they would need to be assaulted, they were told "the boss says we have to do this op."  "The boss" refers to Alan Rosen.  There was already sufficient evidence to make an arrest prior to exposing McKinney to this trauma.

58.     McKinney was ordered to make an appointment at the establishment with the known sexual deviant.  At said appointment she was, unsurprisingly, penetrated in both her vagina and anus by the same individual who had only days before assaulted the HCCO-1 staff member. McKinney was forced to allow this to happen as she was *ordered* to do by her superiors. In order to appease HCCO-1 supervisors and comply with orders, McKinney was sent in to *disrobe with a known rapist,* like a lamb to the slaughter, and allow him to assault her.  Only after the assault was she ordered to give the 'bust' signal so that an arrest could be made.

59.     Immediately after being assaulted at the behest of HCCO-1, McKinney emerged from the establishment to see Constable Alan Rosen, his media director, and news crews assembling for a press conference.  Constable Rosen told Channel 2 news afterwards that "[i]t was very important to me that we move very quickly on this case because of the victim's outcry," ratifying the operation.[2]

60.     Though she was a victim of an unwanted sexual assault, she was treated by HCCO-1 as nothing more than a tool. She was not important enough to be concerned over what she experienced, her feelings, or the fact that she was now a victim like those she wanted so badly to help.

61.     Instead, McKinney was seen to be fodder for a headline arrest. From the moment she walked out, she was all but ignored.

---

[2] *New Masseur at Massage Heights Accused of Sexually Assaulting Woman During Session*, (https://www.click2houston.com/news/2019/08/22/new-masseur-at-massage-heights-accused-of-sexually-assaulting-woman-during-session/)

62.     McKinney drove herself to her SANE (sexual assault) exam, was ordered to call the district attorney to accept her own sexual assault charges while holding back tears, and has since sought the care of a therapist and trauma specialist.  In any situation where a deputy is sent to the hospital with injuries, Alan Rosen has always made it a point to visit them in a showing of support.  In Felecia McKinney's circumstance, she was forced to drive herself and was abandoned by her department, her Constable, and her County

63.     There can be no excuse for willingly offering up this woman to sacrifice herself simply to make a headline and news story. The leadership at HCCO-1 viewed these young officers as mere playthings, sex objects, and disposable props.  Constable Rosen, months later, told the Houston Chronicle that Felecia McKinney "do[es] the job knowing of that danger."

**E.     Jacquelyn Aluotto: The Whistleblower**

64.     Jacquelyn Aluotto was hired as a human trafficking advocate with Harris County Constable's Office Precinct 1 ("HCCO-1") in January of 2019.

65.     Aluotto worked closely as an employee with the entire Human Trafficking division. Her goal, job description, and background were to give women who had been trafficked the care and resources to help them recover and also to allow HCCO-1 to use them as cooperating witnesses against traffickers.

66.     Aluotto is nationally renowned for this work and has been given multiple awards for her work from local, state, and national organizations as well as the United Nations. She made a career and passion of speaking up, serving, and fighting for exploited women and children who cannot speak for themselves.  This case is no different.

67.     Shortly after joining the team, Aluotto realized that Chief Gore and the division were devoting almost no energy or resources to solving cases, giving victims care, following up with trafficked children, or making high-up-the-chain arrests. Instead, nearly all of the unit's energy went into the planning of the aforementioned "bachelor party" stings at Gore's pleasure.

68.     It was clear that not only did Chief Gore and Lt. Rigdon not focus on care for trafficking victims, but they actually did also not focus on solving cases at all.

69.     The focus all went to which male supervisor was "given" which female partner, who was to provide the liquor, and planning the next sting so that everyone could "loosen up and have fun."

70.     On one sting, Aluotto and Gore's female "undercover partner" were interviewing a minor trafficking victim after an arrest was made. Chief Gore burst into the room, intoxicated from the evening's festivities, and pulls his "partner" out of the interview in the middle of the child's outcry before anything of substance was conveyed by the minor victim. Tired and intoxicated, Gore had his fun and was ready to leave.  He demanded the minor female trafficking victim 'hurry up' with her statement and began to yell at her. He did not care about the law enforcement work to be done.

71.     Gore later commanded his "undercover partner" to swear in an arrest warrant affidavit that she *was* present in the interview and received information directly from the minor victim, despite the fact that Gore ordered her out of the room.

72.     It became increasingly clear to Aluotto that in addition to the criminal conduct by law enforcement above, these female deputies were being victimized and exploited themselves as sexual objects by their own supervisors.

73.     As a result of Chief Gore refusing to focus the division on solving cases or following up with trafficking victims, victims went missing, ceased cooperating with investigations, and cases otherwise fell apart.

74.     Aluotto spoke up to her chain of command and was quickly shut down.  This included direct conversations with and complaints made to Constable Alan Rosen.

75.     In January 2020, Aluotto confronted Constable Alan Rosen about Chief Gore's inappropriate activities, including his exploitation of his subordinate officers while using these operations for his own sexual gratification.

76.     Aluotto made it clear that Chief Gore was hiring young, inexperienced officers and forcing them into inappropriate situations. Constable Rosen told Aluotto he would address the issue. Constable Rosen responded that he would speak with him but that Chief Gore could be "trusted."

77.     Nonetheless, the operations continued with Constable Alan Rosen's blessing.

78.     Around this time, Chief of Staff Erica Davis told Aluotto that she needed to stop telling the Constable these things directly "*because that would make him liable*." Aluotto then went to another Captain in the department to discuss the matter.  Later that day, Erica Davis called Aluotto yelling and said "the Constable and I spoke, we are going to handle it.  We don't want other people knowing about it."

79.     Nonetheless, the operations continued.

80.     In April of 2020, Ms. Aluotto complained via email to Chief Gore, Lt. Rigdon, Erica Davis, and Constable Alan Rosen that protocol for helping human trafficking victims was not being followed.  She threatened to "CC" the District Attorney's Office in emails.  Two hours later, she was removed from the Human Trafficking Unit altogether and transferred from the human trafficking division to 'community outreach' and her human trafficking phone and laptop were demanded from her.  Her job description in her new assignment was vague and nondescript, and she was inexplicably *prohibited* from and warned against contacting the human trafficking victims who had come to rely upon her.

81.     In July 2020, Ms. Aluotto took her concerns to Johna Stallings, head of the Sex Crimes Division at the Harris County District Attorney's Office. After no action was taken for several months, Ms. Aluotto told Ms. Stallings that action needed to be taken or Ms. Aluotto would seek relief elsewhere.

82.     Ms. Stallings eventually interviewed some of the female deputies, after which she agreed with Ms. Aluotto that the problem needed to be addressed, and HCCO-1's human trafficking division needed oversight and change.  She questioned whether Gore's actions, sanctioned by Constable Alan Rosen, were criminal.

83.     Nonetheless, months passed with no action. Ms. Aluotto was eventually told by Ms. Stallings in November (after the 2020 election) that the information had been given to Harris County District Attorney Kim Ogg, and that Ms. Ogg was unwilling to initiate an investigation into Alan Rosen's office despite the reported conduct. The Harris County District Attorney's Office referred the matter to be handled internally at HCCO-1.

84.     After election day, Ms. Aluotto was finally contacted by HCCO-1 internal affairs to set up an interview for an 'administrative investigation.'

85.     Ms. Aluotto gave a three-hour videotaped interview at HCCO-1 internal affairs. During the interview, she disclosed the rampant harassment, sexual assault, retaliation, and bullying in the unit, as well as falsified documents, intoxication of commanding officers, and molestation of subordinates.

86.     Ms. Aluotto disclosed how the young female deputies suffered emotional breakdowns from their molestation, and how they were quietly moved to less prestigious duties when they complained.

87.     The following day, pursuant to the custom and practice of HCCO-1's Human Trafficking Division of silencing those who spoke up and pursuant to Alan Rosen's command, Ms. Aluotto's hours were cut to zero thereby terminating her employment.  She was, like all that came before her, finally silenced. Or so they thought.

## COUNT ONE
**Sexual Harassment through 42 U.S.C. §1983**
**The Deputy Plaintiffs against Defendants Rosen, Gore, and Rigdon**

88.     Plaintiffs adopt, reallege, and incorporate all preceding and subsequent paragraphs.

89.     Defendants Rosen, Gore, Rigdon have violated Plaintiffs' rights under the Equal Protection clause of the Fourteenth Amendment through sexual harassment.

90.     Plaintiffs belong to a protected group as they are female.

91.     Defendants Rosen, Gore, and Rigdon had authority over Plaintiffs, and they were acting under color of law at all relevant times.

92.     Plaintiffs have been discriminated against and treated differently than similarly-situated male employees solely because of their gender.

93.     Due to the actions of Defendants Rosen, Gore, and Rigdon, Plaintiffs were subjected to a hostile work environment in which they were targeted for sexual abuse, denigration, and exploitation.

94.     Plaintiffs were subjected to unwelcome sexual harassment, as described above.

95.     Defendant Gore directly harassed the Plaintiffs.

96.     Defendant Rigdon actively assisted Defendant Gore in concealing the illegal treatment of the Plaintiffs.

97.     Defendant Rosen created and oversaw the "bachelor party" unit which subjected untrained subordinate officers to sexual contact from their commanding officers. Defendant Rosen further ratified Defendant Gore's actions in subjecting employees to abusive, traumatic, and harassing work environments.

98.     Defendant Rosen refused to take proper remedial actions when complaints were raised about the hostile work environment created in the Human Trafficking Unit.

99.     Plaintiffs objected to Defendant Gore's misconduct, including his unwelcome sexual advances and molestation.

100.    The harassment suffered by the Plaintiffs was sufficiently severe or pervasive to alter the terms and conditions of their employment and create a discriminatorily abusive working environment.

101.    In addition, Plaintiffs' complaints about their treatment were used by Defendant Gore as a basis for making employment decisions which affected the terms and conditions of Plaintiffs' employment.

102.    Refusing to endure Defendant Gore's disgusting actions resulted in adverse employment actions.

103.    The unlawful conduct of the Defendants as described above was done with intent, malice and/or reckless disregard and/or deliberate indifference to Plaintiffs federally protected rights.

104.    As a proximate result, Plaintiffs have suffered extreme harm including, but not limited to, injury including pain, humiliation, mental anguish and suffering.

**COUNT TWO**
**Sexual Harassment through 42 U.S.C. §1983**
**The Deputy Plaintiffs against Defendant Harris County**

105.    Plaintiffs adopt, reallege, and incorporate all preceding and subsequent paragraphs.

106.    Defendant Harris County has violated Plaintiffs' rights under the Equal Protection clause of the Fourteenth Amendment through sexual harassment.

107.    Harris County, through Defendant and policymaker Alan Rosen, had a policy or custom of subjecting young, vulnerable, untrained deputies to traumatic undercover

"bachelor party" stings in which they were subject to groping, molestation, and unwanted sexual contact by their commanding officers.

108.    Defendant Rosen, acting a final policymaker for Defendant Harris County, intentionally approved and oversaw the operational concept in which in subordinate officers would be forced into inappropriate sexual situations involving their commanding officers.    In doing so, Defendant Rosen showed deliberate indifference for the constitutional injuries that would obviously result from this environment.

109.    Harris County, through Defendant Rosen, had a policy or custom of failing to adopt adequate procedures ensuring that these sexually-charged, unorthodox, and potentially traumatic "bachelor party" sex crimes operations were staffed by officers who had been adequately trained in undercover tactics and who had been adequately prepared to engage in the unusual duties. Instead, in Constable Alan Rosen's official policies for *Covert Operations and Investigations* (Policy #531), "Officer selection criteria for the covert (clandestine) investigators will be made at the discretion of the Investigative Unit Commander." The Investigative Unit commander was Assistant Chief Chris Gore. As discussed above, Defendant Gore specifically selected young, inexperienced women he found attractive, and they were provided no specialized training for the assaults that would occur.

110.    Not only did Constable Rosen fail to adopt policies to ensure properly trained officers were selected for these operations, but he fully approved of the nature of the operations and the nature of Defendant Gore's personnel choices. Constable Rosen also personally witnessed the personnel present during the "bachelor party" stings. Constable

Rosen had actual knowledge that young, inexperienced, and potentially vulnerable officers were serving in these unorthodox roles, heightening his understanding for the need to ensure that these officers were properly trained, supervised, and protected.

111.    Harris County, through Defendant Rosen and other policymakers, failed to train its undercover sex crimes officers in specific skills needed to handle recurring situations which arise in the unique nature of the particular assignment, thus presenting an obvious potential for constitutional violations. Throughout Constable Rosen's official policies for *Covert Operations and Investigations* (Policy #531), the need for specialized training, unique rules, and individual protocols is emphasized for the various types of operations conducted by undercover officers. The rules and regulations for a large variety of tactical operations are described in detail, but there are no rules and regulations concerning Constable Rosen's "bachelor party" stings.

112.    Constable Rosen's official policies for *Covert Operations and Investigations* (Policy #531) contains specific protocols and rules regarding:

   i.   Protocols for operations in sexually oriented businesses, such as massage parlors, adult video arcades, and adult cabarets. In these operations, an undercover officer will pose as a customer.

   ii.  Protocols for operations in gambling and game rooms. In these operations, an undercover officer will pose as a gambler.

   iii. Protocols for stings of sex workers "moving either on foot or by vehicle."

   iv.  Protocols for "Out Call" hotel operations, in which a potential customer is lured to a hotel to be arrested by a single undercover officer posing as a sex worker, supported by a tactical arrest team.

    v.   Protocols for "In Call" operations, in which an undercover officer poses as a customer and travels to a location used by a sex worker.

    vi.   Protocols for surveillance activities, in which undercover officers will collect intelligence on a dangerous location or individual.

    vii.   Protocols for consensual searches, known as "knock-and-talks," in which officers will attempt question subjects at a dangerous location.

    viii.   Protocols for "Clean Buys," in which contraband is purchased by an undercover officer for the purpose of gathering intelligence.

    ix.   Protocols for "Dirty Buys," in which contraband is purchased by a confidential informant under supervision for the purpose of gathering intelligence.

    x.   Protocols for "Buy Busts," in which an undercover officer takes delivery of contraband with the intention of making an immediate arrest.

    xi.   Protocols for search warrants, in which officers enter a potentially dangerous location under court order.

    xii.   Protocols for operations involving "flash funds," which is the display of cash by an undercover officer in front of criminal subjects during an operation.

113.   The existence of detailed protocols for each of these undercover activities recognizes the need to set guidelines required to handle recurring situations which arise in the unusual nature of the specific operations.

114.   However, Harris County, through Defendant Rosen and other policymakers, failed to properly develop and implement protocols for his "bachelor party" operations.

115.   Harris County, through Defendant Rosen and other policymakers, failed to adopt policies to ensure that supervisory officers were not exploiting the unique

circumstances of these "bachelor party" operations to harass, abuse, or traumatize their subordinate officers.

116.    For example, in Constable Rosen's formal policies, there are many rules and protocols regarding the potential for sexually-charged contact between undercover officers and the targets of their investigations. However, none of the policies address the potential for sexually-charged contact between subordinate officers *and their supervisors*, as called for and mandated in these "bachelor party" stings. By failing to adopt formal policies and training on this topic Defendant Harris County, through Defendant Rosen and other policymakers, acted with deliberate indifference, ultimately inviting these kinds of constitutional violations as a result of Constable Rosen's unorthodox "bachelor party" stings.

117.    In typical sex crimes operations, undercover officers are protected from unwanted sexual contact, and specific protocols exist concerning sexual conduct. For example, Constable Rosen's official policies for *Covert Operations and Investigations* (Policy #531) recognizes that "the suspects involved may attempt to try to make sexual contact with the covert officer," and that "when this occurs," the officer will "[d]o what he / she can do to break contact as soon as possible," and will only "remain in a covert status" when "it is a life or death situation." Constable Rosen did not provide any protocols governing sexually-charged contact between subordinate officers and their commanding officers during these "bachelor party" stings.

118.    Harris County, through Defendant Rosen and other policymakers, had a policy or custom of failing to adopt and disseminate adequate policies ensuring the physical

safety and psychological well-being of law enforcement officers ordered to participate in potentially traumatic "bachelor party" operations. Harris County, through Defendant Rosen and other policymakers, failed to adopt policies to ensure that subordinate officers were psychologically and professionally prepared to engage in undercover "bachelor party" operations, including an understanding of their rights.

119.   Even typical sex crimes operations require training, protocols, and psychological safeguards. Yet Constable Rosen's "bachelor party" operations were very different than the sex crimes operations previously conducted by the unit. In most operations, the undercover officer is vulnerable to the investigation's target, but has a measure of safety and predictability from her back-up officers. In Constable Rosen's "bachelor party" stings, the undercover officers had to balance the difficult psychological pressures of undercover work and sexual vulnerability with the authority of the officer's supervisor. Even under the best of circumstances and most noble of intentions, these operations, if not properly planned, staffed, and monitored, would obviously produce these kinds of the constitutional violations.

120.   The Plaintiffs were required by formal policy to obey orders from their superiors, and Assistant Chief Gore was able provide just enough pre-text to cloak his improper actions and harassment in a law enforcement purpose. In the absence of formal policies, training, and supervision of these highly orthodox operations, the ambiguity was predictably exploited by Assistant Chief Gore, Lt. Shane Rigdon, and other supervisors, resulting in a hostile work environment.

121.   Furthermore, Harris County, through Defendant Rosen and other policymakers, failed to adopt policies to monitor and safeguard the well-being of subordinate female officers involved in these unorthodox "bachelor party" operations. Harris County's failure to ensure training and psychological precautions to these undercover officers would have been mitigated if Harris County had adopted to policies to ensure that a neutral advocate was monitoring the well-being of undercover officers placed in this vulnerable position.

122.   Harris County, through Defendant Rosen and other policymakers, failed to adopt policies to ensure that sensitive and potentially traumatic "bachelor party" sex crimes operations were properly monitored, supervised, and reviewed to ensure the safety and well-being of all participants. Given that Defendant Rosen created a sex crimes operation in which young subordinate officers would be required to engage in sexually-charged conduct and contact with their commanding officers, he should have known that specialized monitoring and supervision of the operations was required.

123.   In the alternative, Harris County, through Defendant Rosen and other policymakers acted with deliberate indifference as a matter of law by creating a sex crimes operation in which young subordinate officers would be required to engage in sexually-charged conduct and contact with their commanding officers. Such a policy is outrageous, shocks the conscience, and is obviously inviting the kind of constitutional violations seen in this case.

124.   Harris County, through Defendant Rosen and other policymakers, had a policy of allowing supervising and subordinate officers to become intoxicated during

undercover "bachelor party" operations, or had a custom of failing to adopt policies to ensure that supervising and subordinate officers were not becoming intoxicated during undercover sex crimes operations. According to Constable Rosen's official policies for Covert Operations and Investigations (Policy #531), "Convert [sic] (Clandestine) Investigators, with approval, may only consume one (1) alcoholic beverage per hour during the investigation, not to exceed two (2) alcoholic beverages." However, this policy does not represent the actual custom and practice of the HCCO-1 Human Trafficking Unit as overseen by Constable Rosen. The unit consumed liquor in abundance, and it spent taxpayer funds to do so. The widespread custom and practice of HCCO-1 "bachelor party" stings was a party environment in which supervising officers were consistently intoxicated." The use of alcohol to intoxication was a well-understood and widespread practice in HCCO-1 of which Constable Rosen was actually aware.

125.    Given the potential trauma and unique opportunities for abuse posed by these unorthodox "bachelor party" operations, the Plaintiffs' injuries are a highly predictable or plainly obvious consequence of Harris County's policies and customs.

126.    In light of the unorthodox duties assigned to these supervising and subordinate officers by Defendant Rosen, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that Defendant Rosen and other policymakers of Harris County have shown themselves to be deliberately indifferent to the likelihood of the kinds of injuries and misconduct seen in this case.

127.    These policies and customs described above were either official policies or decisions promulgated and adopted by the county, through Defendant Rosen and other policymakers, or unofficial patterns of widespread practice enacted by Defendant Rosen and other policymakers.

128.    Defendant Harris County, through Defendant Rosen, failed to take appropriate remedial action upon receiving complaints of the misconduct occurring in the "bachelor party" stings.  Defendant Rosen is the final policymaker concerning HCCO-1 and its Human Trafficking Unit and failed to take remedial action subsequent to the Deputy Plaintiffs' injuries.

129.    The failure of the County and its final policymakers to take action establishes that the actions complained of were the result of the county's policies or customs. These subsequent acts by Harris County and its final policymakers demonstrate the existence of the custom and policies that caused the prior unconstitutional action.

130.    There is a direct causal link between the injuries alleged by Plaintiffs and Harris County's policies and customs as described above.

131.    In addition, Harris County also ratified the hostile and abusive behavior. Defendant Rosen, Constable at HCCO-1, is the final policymaker as it concerns the operations of the HCCO-1 Human Trafficking Unit. Defendant Rosen intentionally created and oversaw a new type of operation in which subordinate officers would be subject to sexual contact with their commanding officers, and he intentionally allowed his Assistant Chief to staff this new operation with young, vulnerable officers, while providing them no specialized training or protection. Furthermore, despite Defendant Rosen's actual,

contemporaneous knowledge throughout these events of the specific misconduct of Defendants Gore and Rigdon, Defendant Rosen took no action to cease their egregious misconduct, ratifying their acts.

132.    Defendant Rosen understood the outrageous nature of his "bachelor party" unit from the start, having personally observed its set-up, personnel, and operation. Defendant Rosen actively ratified and oversaw those operations.

133.    Defendant Rosen was also provided actual notice about the misconduct occurring in the "bachelor party" stings from multiple sources throughout the time of its operation, including complaints by the Deputy Plaintiffs and the Whistleblower Plaintiff, as well as others.

134.    There is a direct causal link between the injuries alleged by Plaintiffs and Harris County's ratification of the offensive conduct.

135.    Harris County was grossly negligent in failing to prevent and promptly correct the sexually harassing behavior.

136.    Harris County was grossly negligent in failing to have sufficient anti-harassment policies in place and did not widely disseminate or vigorously enforce any anti-harassment policy it may have had.

137.    Harris County was grossly negligent in failing to guard against this misconduct and in failing to take adequate remedial action.

138.    Harris County was aware of the hostile and abusive environment, and it refused to correct the situation.

139.    The unlawful conduct of Harris County as described above was done with intent, malice and/or reckless disregard and/or deliberate indifference to Plaintiffs' federally protected rights.

140.    The harassment Plaintiffs suffered was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.

141.    As a proximate result, Plaintiffs have suffered extreme harm including, but not limited to, injury including pain, humiliation, mental anguish and suffering.

### COUNT THREE
### Sexual Battery through 42 U.S.C. §1983
### The Deputy Plaintiffs against Defendant Gore

142.    Plaintiffs adopt, reallege, and incorporate all preceding and subsequent paragraphs.

143.    Defendants Gore has violated Plaintiffs' rights under the Due Process clause of the Fourteenth Amendment through sexual battery, thus violating their bodily integrity.

144.    Defendant Gore, acting within the course and scope of his employment, intentionally caused the touching of, or application of force to, the bodies of the Plaintiffs, in a harmful, offensive, and sexual manner, without their consent.

145.    Defendant Gore also intentionally attempted or threatened to inflict harmful, offensive, and sexual contact on the Plaintiffs' bodies. This conduct, coupled with his apparent ability to cause harm upon the Plaintiffs, created a reasonable apprehension of bodily harm or offensive conduct on the part of the Plaintiffs.

146.    Defendant Gore could not have assaulted the Plaintiffs absent his authority as an agent for the State.

147.    As a proximate result, Plaintiffs have suffered extreme harm including, but not limited to, injury including pain, humiliation, mental anguish and suffering.

## COUNT FOUR
### Sexual Battery through 42 U.S.C. §1983
### The Deputy Plaintiffs against Defendant Harris County

148.    Plaintiffs adopt, reallege, and incorporate all preceding and subsequent paragraphs.

149.    Defendant Harris County has violated Plaintiffs' rights under the Due Process clause of the Fourteenth Amendment due to sexual battery, thus violating their bodily integrity.

150.    Defendant Gore could not have assaulted the Plaintiffs absent his authority as an agent for the State.

151.    Plaintiffs reported the assaults through multiple channels at HCCO-1, thereby taking advantage of corrective opportunities.

152.    The policies and customs of Defendant Harris County, described above, as enacted through Defendant Rosen and other policymakers, showed deliberate indifference towards the probability of an offensive sexual battery in violation of Plaintiffs' federally protected rights.

153.    The policies and customs of Defendant Harris County, described above, as enacted through Defendant Rosen and other policymakers, was a proximate cause of the sexual battery suffered by Plaintiffs. The policies and customs of Defendant Harris County

which caused a hostile work environment likewise caused the sexual batteries by Chief Gore.

154.    Defendant Harris County, through Defendant Rosen, received subsequent complaints of the sexual batteries, and it refused to correct the situation. These subsequent acts demonstrate the existence of the policies or customs, described above, which caused the prior constitutional violations.

155.    In addition, Defendant Harris County, through Defendant Rosen and other policymakers, ratified the sexual batteries. Defendant Rosen created and oversaw the "bachelor party" operations knowing the subordinate officers would be subjected to offensive sexual contact from their commanding officers. Throughout the operations, Defendant Rosen was actually aware that offensive and harmful sexual batteries were occurring.

156.    The unlawful conduct of Harris County as described above was done with intent, malice and/or reckless disregard and/or deliberate indifference to Plaintiffs' federally protected rights.

157.    The harassment Plaintiffs suffered was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.

158.    As a proximate result, Plaintiffs have suffered extreme harm including, but not limited to, injury including pain, humiliation, mental anguish and suffering.

## COUNT FIVE
### Sexual Battery through 42 U.S.C. §1983
### Felecia McKinney against Defendant Rosen, Gore, and Rigdon
### (Massage Parlor Incident)

159.    Plaintiff Felecia McKinney adopts, realleges, and incorporates all preceding and subsequent paragraphs.

160.    Defendant Rosen has violated McKinney's rights under the Due Process clause of the Fourteenth Amendment due to sexual battery, violating her bodily integrity.

161.    As described above, Defendant Rosen ordered an operation in which Felecia McKinney was sent into a massage parlor with the express intention of having her be sexually assaulted by a suspected rapist.

162.    McKinney was ordered to suffer this sexual assault.

163.    Defendant Rosen maliciously and callously exposed McKinney to this assault with the intent that she be assaulted so that a public arrest could be made.

164.    Defendant Rosen could not have ordered the sexual assault of McKinney absent his authority as an agent for the State.

165.    As a proximate result, Felecia McKinney has suffered extreme harm including, but not limited to, injury including pain, humiliation, mental anguish and suffering.

## COUNT SIX
### Sexual Battery through 42 U.S.C. §1983
### Felecia McKinney against Defendant Harris County
### (Massage Parlor Incident)

166.    Plaintiff Felecia McKinney adopts, realleges, and incorporates all preceding and subsequent paragraphs.

167.   Defendant Harris County has violated McKinney's rights under the Due Process clause of the Fourteenth Amendment due to sexual battery, thus violating her bodily integrity.

168.   Harris County, through its final policymaker Defendant Rosen, failed to ensure the physical safety and psychological well-being of McKinney while she was ordered to conduct an undercover investigation and arrest of a suspected rapist.

169.   Harris County, through its final policymaker Defendant Rosen, intentionally subjected to McKinney to a disturbing sexual assault.

170.   In typical sex crimes operations, undercover officers are protected from unwanted sexual contact, and specific protocols exist concerning sexual conduct. For example, Constable Rosen's official policies for Covert Operations and Investigations (Policy #531) recognizes that "the suspects involved may attempt to try to make sexual contact with the covert officer," and that "when this occurs," the officer will "[d]o what he / she can do to break contact as soon as possible," and will only "remain in a covert status" when "it is a life or death situation." Officers are instructed to avoid and prevent sexual contact, and they are instructed to take reasonable steps to avert the possibility of sexual acts.

171.   However, Defendant Rosen, acting as final policymaker for Harris County, ordered an operation in which it was intended that McKinney would suffer a sexual assault. In doing so, Defendant Rosen intentionally violated McKinney's federally protected rights.

172.    Furthermore, Harris County, through Defendant Rosen, failed to ensure that Felecia McKinney was psychologically and professionally prepared to engage in such an operation, including an understanding of her rights.

173.    Given the trauma likely to be suffered by an undercover officer ordered to endure a sexual assault, McKinney's injuries are a highly predictable or plainly obvious consequence of Defendant Rosen's actions as final policymaker for Harris County.

174.    There is a direct causal link between the injuries alleged by McKinney and Harris County's actions as described above.

175.    The unlawful conduct of Harris County as described above was done with intent, malice and/or reckless disregard and/or deliberate indifference to McKinney's federally protected rights.

176.    As a proximate result, McKinney has suffered extreme harm including, but not limited to, injury including pain, humiliation, mental anguish and suffering.

### COUNT SEVEN
**Violation of Equal Protection by Loss of Bodily Integrity through 42 U.S.C. §1983**
**The Deputy Plaintiffs against Defendant Harris County**

177.    Plaintiffs adopt, reallege, and incorporate all preceding and subsequent paragraphs.

178.    Plaintiffs had the right to bodily integrity, which is a substantive due process right.

179.    Due to the policies, customs, and direct intentional actions of Harris County described above, Plaintiffs suffered unconstitutional invasions of their bodily integrity

under color of state law. Those policies, customs, and intentional acts showed a deliberate indifference to this type of constitutional injury.

180. These invasions of Plaintiffs' bodily integrity would not have occurred but for the policies, customs, and intentional acts of Defendant Harris County, described above, as implemented, ratified, and overseen by Constable Rosen. Defendant Harris County's acts and omissions described above were a proximate cause of the Plaintiffs' loss of bodily integrity.

181. In addition, Defendant Harris County, through Defendant Rosen and other policymakers, ratified the invasion of Plaintiffs' bodily integrity, as described above.

182. The loss of bodily integrity suffered by Plaintiffs was sufficiently severe to violate Plaintiffs' right to equal protection under the law.

183. As a proximate result, Plaintiffs have suffered extreme harm including, but not limited to, injury including pain, humiliation, mental anguish and suffering.

## COUNT EIGHT
### Retaliation through 42 U.S.C. §1983
### The Deputy Plaintiffs against Defendant Harris County

184. Plaintiffs adopt, reallege, and incorporate all preceding and subsequent paragraphs.

185. Plaintiffs engaged in statutorily protected conduct and speech of a matter of public concern for Harris County. Plaintiffs suffered sexual harassment and sexual assault which they reported through proper channels at HCCO-1.

186.    As a direct and proximate result of Plaintiffs' complaining activities, Plaintiffs have suffered materially adverse employment actions, including ridicule, denigrations, harassment, threats of additional undercover operations in which they would be abused, and transfer out of the human trafficking unit to less prestigious positions.

187.    Plaintiffs' interest in commenting on the matters of public concern to Harris County outweighed the defendant's interest in promoting efficiency.

188.    Harris County was aware of Plaintiffs' protected conduct and there was a close temporal proximity between this awareness and the adverse employment which resulted.  Plaintiffs' protected speech was the cause in fact and motivation for said adverse employment action.

189.    Plaintiffs have been damaged as a result of the constitutional violations and deprived of their rights to Equal Protection for complaining about these violations.

190.    As a proximate result, Plaintiffs suffered extreme harm and injury including, but not limited to, loss of income, pain, inconvenience, embarrassment, humiliation, mental anguish and suffering.

## COUNT NINE
### Retaliation through 42 U.S.C. §1983
### Whistleblower Plaintiff against Defendant Harris County

191.    Plaintiff Jacqueline Aluotto adopts, realleges, and incorporates all preceding and subsequent paragraphs.

192.    Plaintiff had a good faith, reasonable belief that Defendant Rosen, Defendant Gore, and Defendant Rigdon had engaged in sexual harassment and/or sexual battery.

193.    Plaintiff engaged in statutorily protected conduct and speech. After her complaints were ignored by her chain of command and rebuffed by the Harris County District Attorney's Office, Plaintiff made direct complaints of harassment, abuse, and other unlawful conduct to HCCO-1 Internal Affairs Division.

194.    The information Plaintiff reported to her chain of command, the District Attorney's Office, and HCCO-1 Internal Affairs were a matter of public concern to Harris County.

195.    Plaintiff was terminated the following day, an adverse employment decision.

196.    Plaintiff's interest in commenting on the matter of public concern outweighed the defendant's interest in promoting efficiency.

197.    Plaintiff's termination was causally related to her complaints of sexual harassment, abuse, and other unlawful conduct at HCCO-1.

198.    Harris County was aware of Plaintiffs' protected conduct and there was a close temporal proximity between this awareness and the adverse employment which resulted.

199.    Plaintiff has been damaged as a result of the constitutional violations and deprived of their rights to freedom of speech for complaining about these violations.

200.    As a proximate result, Plaintiff suffered extreme harm and injury including, but not limited to, loss of income, pain, inconvenience, embarrassment, humiliation, mental anguish and suffering.

## PRAYER

Plaintiff respectfully prays that this Court will assume jurisdiction of this action, and after trial, entered an Order requiring Defendants to pay Plaintiffs' nominal, actual, compensatory, and punitive damages. Plaintiffs further pray for such other and further relief and benefits as the cause of justice may require, including, but not limited to, an award of costs, attorney's fees and expenses incurred by this litigation.

### PLAINTIFFS DEMAND A TRIAL BY JURY

Respectfully submitted,

**THE AKERS FIRM, PLLC**

*/s/ Brock C. Akers*
Brock C. Akers
TBN: 00953250
*/s/ Cordt C. Akers*
Cordt C. Akers
TBN: 24080122
3401 Allen Parkway, Suite 101
Houston, TX 77019
Phone: (713) 877-2500
Fax:    (713) 583-8662
bca@akersfirm.com
cca@akersfirm.com

ATTORNEYS FOR FELECIA McKINNEY and JACQUELYN ALUOTTO

**FARRAR & BALL, LLP**

/s/ William R. Ogden
WILLIAM R. OGDEN
Texas State bar No. 24073531
Federal Bar No. 2202355
/s/ Mark Bankston
MARK BANKSTON
Texas State bar No. 24071066
117 Herkimer St.
Houston, TX 77008
713.221.8300 Telephone
713.221.8301 Fax
bill@fbtrial.com
mark@fbtrial.com

ATTORNEY FOR LIZ GOMEZ and
MARISSA SANCHEZ