IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **Liz Gomez, Marissa Sanchez**, | § | |
| **Felicia McKinney, Jacquelyn Aluotto**, | § | |
| and **Jassmine Huff,** | § | |
| *Plaintiffs* | § | |
| | § | |
| v. | § | Civil Action No.4:21-cv-01698 |
| | § | |
| **Harris County, Texas**; | § | (Jury Demanded) |
| | § | |
| *Defendant* | § | |

## PLAINTIFFS' MOTION TO COMPEL DISCOVERY

Comes now, Plaintiffs, and files this Motion to Compel Discovery.

## <u>BACKGROUND</u>

Beginning in 2019, the Harris County Precinct 1 Constable's office decided to change its format of its undercover operations in its human trafficking division to "bachelor party" stings. During these "bachelor party" operations, the division would set up surveillance in a hotel room or suite, and both male and female deputies would be present in an undercover capacity in a party-like atmosphere, alcohol included, where the female deputies were ordered to pose as other prostitutes present for the same purpose. Ideally, this would entice any prostitutes called to the location to feel more comfortable in quickly agreeing to sex in exchange for a fee, and an arrest could be made. This type of operation did not result in more productivity; it did provide an opportunity though for the male deputies to have more fun under the guise of actual policework. Each and every one of these "bachelor party" stings were county-sanctioned operations. During the operations female deputies were required to be groped and fondled by their superiors and remove their clothing.

On May 24, 2021, Plaintiffs filed suit against Defendant, alleging a number of civil rights violations against Harris County, specifically for events which occurred in connection with Harris County Constable's Office, Precinct 1's human trafficking unit. The Complaint alleges civil rights violation by Defendant including sexual harassment, sexual battery, and Violation of Equal Protection by Bodily Integrity under via 42 USC 1983. Initially, three individuals were included as defendants with Defendant Harris County.[1] Harris County's initial three co-defendants were Defendants Rosen, Gore and Rigdon. All Defendants, other than Harris County, filed Motions to Dismiss under Federal Rule of Civil Procedure Rule 12. The Court Granted Defendant Rosen's Motion to Dismiss and denied relief to Defendants Gore and Rigdon.[2] Following the Court's rulings on Defendants' Motions to Dismiss, Defendants Gore and Rigdon appealed. During the appeal, Plaintiffs dismissed Defendants Gore and Rigdon, leaving Harris County as the remaining Defendant.

Following the case returning to the 5th Circuit Court from Appeals, the parties agreed to exchange Rule 26 initial disclosures on February 21, 2022.[3] On February 21, 2022, Plaintiffs and Defendant Harris County exchanged disclosures.[4] In its Disclosures, Defendant Harris County took the following position:

**(2) A copy — or a description by category and location — of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.**
**RESPONSE:**

Harris County is not aware of any such information in its

---

[1] Plaintiffs Original Complaint
[2] Memorandum Opinion and Order
[3] 02.01.2022 Email Sandill to Ogden re: Confirming Date to Exchange Disclosures
[4] Defendant Harris County, Texas's Rule26(a)(1) Disclosures

possession, custody, or control at this time. Harris County reserves the right to amend or supplement its disclosure of documents as this case progresses.[5]

After conferring with defense counsel, we understand now that Defendant Harris County's position is not that documents do not exist, but that Defendant Harris County is not in possession, and instead the Harris County Precinct 1 Constable's Office is the appropriate entity in possession, custody, or control of any responsive evidence, outlined in FRCP Rule 26(a)(1)(A)(ii). Contrary to Defendant's disclosures, Plaintiffs believe that Defendant Harris County is in fact in possession, custody, and control of said documents. Surely, after nearly a year of the case being on file, the County isn't stating that they do not have a single piece of evidence to support any of its defenses. Rule 26 is designed to expedite the litigation process. Therefore, Plaintiffs file this Motion to Compel the evidence outlined in FRCP Rule 26.

## ARGUMENT

"[F]ederal courts have consistently held that documents are deemed to be within [a party's] 'possession, custody or control' for the purposes of Rule 34 if the party has actual possession, custody, or control, or has the legal right to obtain the documents on demand." *Torrey v. Infectious Diseases Soc'y of Am.,* 334 F.R.D. 79, 85 (E.D. Tex. 2019), quoting *A. Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186, 189 (C.D. Cal. 2006).

The party seeking discovery must "make a showing that the other party has control over the documents sought." *S. Filter Media, LLC v. Halter,* No. CIV.A. 13-116-JJB-RL, 2014 WL 4278788, at *5 (M.D. La. Aug. 29, 2014). "Typically, what must be shown to establish control over documents in the possession of a non-party is that there is "a relationship, either because of

---

[5] Id.

some affiliation, employment, or statute, such that a party is able to command release of certain documents by the non-party person or entity in actual possession." *Id.,* quoting *Estate of Monroe v. Bottle Rock Power Corp.,* No. 03–2682, 2004 WL 737463, at * 10 (E.D. La. April 2, 2004).

Evidencing the relationship between Defendant Harris County and the Harris County Precinct 1 Constable's Office, Courts have held the "Harris County Constable Precinct [1] is a department of Harris County. It does not have the legal capacity to sue or be sued." *Turnage v. County,* No. CV H-14-2481, 2018 WL 1832321, at *3 (S.D. Tex. Apr. 16, 2018). The Texas Constitution classifies constables as "county officers." Tex. Cons. Art. V § § 18, 24; *see also id.* Art. XVI § 61 (requiring counties to pay all "constables, deputy constables and *63 precinct law enforcement officers" on a salary basis, while all fees earned by county and precinct officers must be paid into "the County treasury"). The Texas Legislature does too. *See* Tex. Loc. Gov't Code § 87.012(12) (identifying constables as county officers subject to removal, as well as any other "county officer, not otherwise named by this section"); id. § 87.041(a)(10) (authorizing county commissioner's court to fill vacancies of the constable's office); id. § 86.001(a) (obligating elected constable who wishes to appoint a deputy to apply in writing to the commissioner's court and show that it is necessary to appoint a deputy to handle the business of the constable's office); id. § 152.001 (authorizing county to pay the compensation, expenses, and allowances of county officers from the county's general fund). That the County is divided into precincts matters not. The "Constitution and... the Local Government Code make it clear that a constable is... a county officer regardless of the county's subdivision into precincts." *Harris County v. Walsweer,* 930 S.W.2d 659, 666-67 (Tex. App. - Houston [1st Dist.] 1996, writ denied). And, as the Attorney General recognized, a constable's law enforcement jurisdiction "extends to the entire county." Op. Tex. Att'y Gen. No. GA-0189 at 4 (2004).

Defendant Harris County's attempt to obfuscate its discovery obligations fails to pass muster. The *Turnage* Court's holding clearly prevents a plaintiff from directly suing a constable's office. *Turnage,* No. CV H-14-2481, 2018 WL 1832321, at *3 (S.D. Tex. Apr. 16, 2018). *Turnage* requires a Plaintiff to sue a county rather than a county constable. Yet, Defendant Harris County's approach to discovery in this case would require a third-party subpoena to an entity that lacks the power to be sued. Defendant Harris County's conduct cannot be, and is not, the proper, good-faith, approach to discovery obligations.

There is no question that evidence exists in the Harris County Precinct 1 Constable's Office. We know this because Plaintiffs are in possession of evidence that clearly shows additional items exist which should have been produced. For instance, in Plaintiffs' Disclosures to Defendant Harris County, Plaintiffs produced hundreds of text messages, emails, photographs, and documents. This includes:

1. The Harris County Operations Plan showing female deputies would be required to expose their genitalia[6]
2. Transcript of audio recording between plaintiff and Harris County employees;[7]
3. Text Messages between County Officials and Plaintiffs,[8]
4. Photographs exhibiting Inappropriate Sexual Conduct during the undercover operations,[9]

Here, Plaintiffs produced over three thousand pages of documents in its disclosures. Defendant Harris County did not produce a single page. It is an absolute certainty that this evidence exists, and an absolute certainty that it is in possession of the County. We know that Defendant Harris County has, if not already deleted, hours' worth of video footage of the bachelor parties from multiple camera angles. The video is obviously relevant and obviously critical evidence which should not withheld and will foreseeably be relied upon by both parties –as it contains the

---

[6] Attached as Exhibit 5
[7] Attached As Exhibits 6
[8] Attached As Exhibit 7
[9] Attached as Exhibit 8

truth of what occurred. Because Plaintiffs are in possession of communications between Plaintiffs and County employees and officials, as well as the department's undercover operations plans, Plaintiffs are certain that documents in fact exist in the Harris County Constable's Office. It is the County who owns the computers, emails, and communications from and to county employees conducting county business. The Court in *Walsweer* is unambiguous in identifying whether a constable's office are separate and distinct entities, stating The "Constitution and... the Local Government Code make it clear that a constable is... a county officer regardless of the county's subdivision into precincts." *Walsweer,* 930 S.W.2d 659, 666-67 (Tex. App. - Houston [1st Dist.] 1996, writ denied).

## CONCLUSION

It is now clear that Defendant Harris County is more interested in bureaucratic gamesmanship, rather than approaching discovery in good faith. Considering the case law and arguments presented above, Plaintiffs request the Court to Grant an Order Compelling Defendants to produce documents outlined in FRCP Rule 26.

Date: February 25, 2022

Respectfully submitted,

**THE AKERS FIRM, PLLC**

*/s/ Brock C. Akers*
Brock C. Akers
TBN: 00953250
*/s/ Cordt C. Akers*
Cordt C. Akers
TBN: 24080122
3401 Allen Parkway, Suite 101
Houston, TX 77019
Phone: (713) 877-2500
Fax:    (713) 583-8662
bca@akersfirm.com
cca@akersfirm.com

ATTORNEYS FOR FELICIA McKINNEY,
JASSMINE HUFF, and JACQUELYN ALUOTTO

**FARRAR & BALL, LLP**

/s/ William R. Ogden
WILLIAM R. OGDEN
Texas State bar No. 24073531
Federal Bar No. 2202355
/s/ Mark Bankston
MARK BANKSTON
Texas State bar No. 24071066
117 Herkimer St.
Houston, TX 77008
713.221.8300 Telephone
713.221.8301 Fax
bill@fbtrial.com
mark@fbtrial.com

ATTORNEYS FOR LIZ GOMEZ and MARISSA
SANCHEZ

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 25, 2022, I electronically filed the foregoing document

with using the CM/ECF system, and a copy of this filing has been forwarded to all counsel of

record in accordance with the ECF local rules.

*/s/ William R. Ogden*
William R. Ogden

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **Liz Gomez, Marissa Sanchez,** | § | |
| **Felecia McKinney,** and **Jacquelyn Aluotto** | § | |
| | § | |
| *Plaintiffs* | § | |
| | § | |
| v. | § | Civil Action No._____ |
| | § | |
| **Harris County, Texas;** | § | (Jury Demanded) |
| **Alan Rosen**, *in his individual capacity*, | § | |
| **Chris Gore**, *in his individual capacity*, | § | |
| **Shane Rigdon**, *in his individual capacity* | § | |
| | § | |
| *Defendants* | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

For their Complaint, Plaintiffs, by and through their attorneys, allege as follows:

## PRELIMINARY STATEMENT

1.  Under the supervision of Constable Alan Rosen at the Harris County Constable's Office, Precinct One, young female deputies were handpicked for "undercover operations" under the guise of legitimate police work were molested and traumatized by their intoxicated male commanding officers for their own sexual gratification. What began as an idea for "bachelor party" prostitution stings soon grew into a booze-fueled playground for sexual exploitation in which young, untrained deputies were subject to disgusting abuse. Both Constable Rosen and the Harris County District Attorney's Office have known about this abuse for months, but they refused to take any action and rebuffed

1



anyone who complained. Constable Alan Rosen attended at least one of these 'parties' personally. Three of the young deputies spoke up about their abuse to their supervisors at the Constable's Office, including Constable Rosen's chief of staff, but they were ridiculed by their commanders, retaliated against by their abusers, and quietly reassigned to less prestigious duties.

2.     A human trafficking advocate employed by Constable Rosen's office also vigorously complained to her chain of command, Constable Rosen, and the District Attorney's Office, all of whom either rebuffed or outright ignored her. She finally spoke to the Internal Affairs division of the Constable's Office, where she gave an extensive interview concerning the outrageous abuse of these young officers. On the very next day, she was fired.

3.     While self-describing as a "second-chance guy,"[1] Constable Rosen and The County have shown that they are deliberately indifferent to the abuse suffered by these brave women and others.   As such, this lawsuit has become necessary to bring accountability for the horrific ordeal of these young law enforcement deputies and ensure that their experience is never repeated.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 because this action involves claims arising under federal law, including under the Constitution of

---

[1] *Pct. 1 Sergeant Investigated for Child Sex Abuse Fired From Harris County Sheriff's Office in 2013,* (https://www.click2houston.com/news/local/2021/05/22/pct-1-sergeant-investigated-for-child-sex-abuse-fired-from-harris-county-sheriffs-office-in-2013/)

2

the United States of America, enforceable through 42 U.S.C. § 1983 and under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, et seq.).

5.      Venue is proper under 28 U.S.C § 1391(b)(1) and (d) because the Defendants Harris County, Gore, and Rigdon reside in this district, Defendant Harris County has its principal place of business in this judicial district, and all of the acts and occurrence that give rise to this lawsuit took place in this judicial district.

## THE PARTIES

6.      Plaintiffs Liz Gomez, Marissa Sanchez, and Felecia McKinney ("The Deputy Plaintiffs") are former and current Deputies of the Harris County Constable's Office. They are each citizens of Texas.

7.      Plaintiff Jacquelyn Aluotto ("The Whistleblower Plaintiff") is a human trafficking advocate formerly employed by Harris County to work with the Human Trafficking Unit at the Harris County Constable's Office, Precinct 1. She is a citizen of Texas.

8.      Defendant Alan Rosen is the Harris County Constable for Precinct One. He is a citizen of Texas. At all material times, Defendant Rosen was acting under color of state law.  At all material times, Defendant Rosen was acting in his official capacity.

9.      Defendant Chris Gore is Assistant Chief at the Harris County Constable's Office, Precinct One. He is a citizen of Texas. At all material times, Defendant Gore was acting under color of state law.  Defendant Gore was further acting in his managerial capacity as an official and executive within the Harris County Constable's Office, Precinct One.

10. Defendant Shane Rigdon is a Lieutenant at the Harris County Constable's Office, Precinct One. He is a citizen of Texas. At all material times, Defendant Rigdon was acting under color of state law. Defendant Rigdon was further acting in his managerial capacity as an official and executive within the Harris County Constable's Office, Precinct One.

11. Defendant Harris County is a political subdivision of the State of Texas, organized and existing by virtue of the laws of Texas. The Harris County Constable's Office, Precinct One was at all material times a Harris County agency through which Harris County fulfills its policing functions.

## FACTS

### A. Alan Rosen's Human Trafficking Unit

12. Harris County Constable's Office, Precinct One ("HCCO-1") employs a grant-funded Human Trafficking Unit. The unit is an opportunity for notoriety and media attention for this Constable's office. The Human Trafficking Unit is overseen by Constable Alan Rosen, who is the final policymaker of the entity. Field operations are managed by Asst. Chief Chris Gore and Lieutenant Shane Rigdon.

13. In order to make arrests in human-trafficking matters, undercover operations and stings are common in which a male undercover officer will pose as a "John" in order to get a trafficked sex worker to agree to an illegal act and then make the arrest. These young women are truly victims of their sex traffic business handlers, and the intent of this federally funded unit is to encourage these victims to identify the individuals at the heart

4

of the illegal operation and to stop the business at its source by further arrests and prosecutions.

14.     Chief Gore, with the approval of Constable Rosen, decided to change the format of the HCCO-1 operations to "bachelor party" stings. In Gore's "bachelor party" operations, the division would set up surveillance in a hotel room or suite, and both male and female deputies would be present in an undercover capacity in a party-like atmosphere where the female deputies would pose as other prostitutes present for the same purpose. Ideally, this would entice any prostitutes called to the location to feel more comfortable in quickly agreeing to sex in exchange for a fee, and an arrest could be made.  This type of operation did not result in more productivity; it did provide an opportunity though for the male deputies to have more fun under the guise of actual policework.  Each and every one of these "bachelor party" stings were county-sanctioned operations. Despite being "in a legal gray area," as Chief Gore would refer to the operations when discussing them with his underlings, they were done in accordance with department policy, set and approved by Rosen.

15.     In fact, when launching the "bachelor party" stings, Constable Rosen personally visited the sting and fully approved Chief Gore's operation and personnel.

16.     Given the unusual, sensitive, dangerous, and potentially traumatic nature of the operations, proper police procedure dictates that deputies with undercover training would be given these roles. However, HCCO-1 's leadership had different plans.

17.     Chief Gore hand-picked female deputies for these undercover operations without regard to any undercover training they might have. Indeed, none of those selected

were trained in this capacity. Rather, Chief Gore chose his partners based on his personal taste in women - young, attractive, and Latina.

**B.     Liz Gomez: The Recruit**

18.     Liz Gomez was an inexperienced Deputy Officer that was hand-picked by Chief Gore for these operations in 2019.

19.     Gomez had no training in undercover operations, nor any training to prepare her to participate in sexually-charged "bachelor party" stings.

20.     Gomez was continuously subjected to sexual harassment, unwarranted touching, unwanted kissing, molestation, and sexual ridicule during her work on the Human Trafficking Unit.

21.     Chief Gore instructed Gomez to purchase new and revealing clothing and send images via text to Chief Gore while shopping.   Gore would relay the message "that's not slutty enough" while Gomez was trying on the clothing at the store, and was ordered to purchase something more provocative.

22.     Gomez was then ordered to try on the dresses for Gore in his office.

23.     Gomez was ordered to accompany Chief Gore to an adult sex shop where he would "pick out some props" and "work on chemistry" with her. After picking up a product labeled "cock sleeve," Chief Gore commented to the young female deputy "oh I bet you would like this." He also instructed Gomez to purchase dildos and to "pick out the ones you would personally prefer." These sex toys were paid for with County funds.  This trip to the sex shop was also the first of several instances where Chief Gore told Liz Gomez she was not allowed to work with any other male deputies…she was "his."

6

24. While Chief Chris Gore was present at the "bachelor party" stings in an undercover capacity, with his chosen female "undercover" to molest, he specifically instructed all deputies *__not__* to include his name when listing those present in their offense reports. This instruction was given despite the fact that quite obviously Chief Gore would be an eyewitness to the conduct giving rise to a potential arrest, in violation of criminal discovery statutes.

25. Female deputies were ordered to purchase and wear revealing clothing for these operations. Each of them was ordered that during these operations "to maintain cover" Chief Gore would be lying down on top of them, fondling their breasts and bodies. They were never warned, however, that during this conduct Chief Gore would be wearing only boxer shorts, fully aroused, drunk, kissing and licking their bodies, and giddy after every sting. Each time Chief Gore molested Liz Gomez during these County-sanctioned operations, she would be fighting back the urge to break down in tears.

26. Alcohol was purchased with HCCO-1 petty cash and consumed in abundance. The male supervisors would continually pressure female deputies to drink. Gore would tell the female deputies to "drink up," "get loose," and that it was time to "start the party." The "stings" were indeed more of a party atmosphere than an actual operation.

27. Despite a formal policy regarding alcohol consumption while undercover, it was the widespread custom and practice of the unit to consume large amounts of alcohol during the operations, as approved by Constable Rosen. Furthermore, the female deputies were pressured by Gore and Rigdon to take shots of alcohol because he "wants us to bond"

and to "loosen up and have a good time." This involved drinking to excess, and at least some male deputies being too drunk to drive home after the operations were over.

28.     There were several cameras set up for viewing in the surveillance room for the operation. Cameras were set up so that the entire room was viewable. Chief Gore, however, instructed the surveillance teams to ensure that none of the "party scenes" were caught on the footage that would be provided to the District Attorney's Office for any arrests.

29.     Lieutenant Shane Rigdon would review all surveillance of the operations the day following the evening stings and delete footage that he declared "lacked evidentiary value" before providing the evidence to the District Attorney's Office, again in violation of criminal discovery statutes.

30.     Following her first two operations, Gomez asked to be removed from the undercover team. After ridicule and denigration, her request was reluctantly granted, and she was subjected to continuous harassment from her superiors for "not having what it takes."

## C.     Marissa Sanchez: The Replacement

31.     When Liz Gomez was removed from the team, Marissa Sanchez, a rookie Deputy, was specifically handpicked by Chief Gore for the open position of "his girl."

32.     Sanchez was an inexperienced Deputy with no training in undercover operations, and no training to prepare her for these sexually-charged stings. Chief Gore instructed her that she would likewise be "his girl."

33.    Sanchez was continuously subjected to sexual harassment, unwarranted touching, unwanted kissing, molestation, and sexual ridicule during her work on the Human Trafficking Unit.

34.    Sanchez was ordered to participate in the "bachelor party" stings in an undercover capacity.

35.    Sanchez was not provided with any training for her duties. She was simply instructed, as was Liz Gomez, to wear revealing clothing, simulate sexual activity, and allow Chief Gore to kiss, touch, and fondle her.

36.    Sanchez was instructed by Chief Gore that she would be "his girl" and not to work with any other male deputies.

37.    At the onset of her first operation before any suspects arrived, Sanchez's training consisted of being in a room with her male superiors while dressed in revealing clothing and being told to "show us what you got." She was then told that meant for her to start giving her male superior a lap dance.

38.    Like Gomez, Sanchez was told "if the scenario calls for it, you may need to take off your clothes." As the first suspects arrived and the sting began, Chief Gore immediately took off Sanchez's bra without warning and for no real reason. He then threw her bra across the room. This conduct would become his routine at the beginning of every single operation.  While her breasts and naked body were exposed due to Chief Gore's actions, he would continuously laugh, even after the undercover operation ended.

39.    Chief Gore would maneuver his body on top or under Sanchez, where she could feel his arousal. Chief Gore also would immediately begin kissing and licking

9

Sanchez's neck and chest. Chief Gore was intoxicated during these assaults due to the shots of hard liquor he insisted all undercovers consume before and during operations and the cases of beer the male deputies consumed throughout the operations.

40.     Once the suspects were arrested, Chief Gore would make it a point to walk slowly to find and retrieve Sanchez's bra and would continuously make inappropriate comments about her naked body. This was done after the arrests had been made, and no possible police function served.

41.     Sanchez would then face inappropriate comments and treatment at the Constable stationhouse between stings from her male superiors, including Chief Gore and Lt. Shane Rigdon commenting on how her body looked naked.

42.     Chief Gore would also make inappropriate comments about Sanchez's boyfriend and personal relationship. These comments were the offspring of Chief Gore's personal jealousy, and Sanchez was retaliated against as a result of this jealousy.

43.     Retaliation included verbal harassment, hostile work environment, and the direct threat "we are doing another operation next week and every week." Chief Gore was going to get what he wanted, regardless of how.

44.     Sanchez finally built up the courage to report this outrageous conduct to Constable Alan Rosen. After making an appointment to do so, she was stopped outside the office by his Chief of Staff, Erica Davis, who advised Sanchez would be meeting with her instead. After disclosing the horror she was forced to go through at the behest of her commanding officer, Sanchez was handed her transfer papers out of the unit to less prestigious duties. No action was taken against Chief Gore or Lieutenant Rigdon.

45.   That very evening, as Sanchez walked to her car in tears and disbelief, Chief Gore and Alan Rosen were seen walking out of the building, laughing and giving each other a hug goodbye.

**D.   Felecia McKinney: The Sacrificial Lamb**

46.   Felecia McKinney was likewise a young Deputy, also given no undercover training, selected by Chief Gore for the Human Trafficking Unit.

47.   Like Liz Gomez and Marissa Sanchez, Felecia McKinney had no applicable training in undercover operations or any training to prepare them on the sexually-charged stings.

48.   McKinney was continuously subjected to sexual harassment and sexual ridicule during her work on the Human Trafficking Unit.

49.   McKinney was ordered to participate in the "bachelor party" stings in an undercover capacity.

50.   McKinney was ordered by her superior officers to wear revealing clothing and ordered to expose herself during operations 'to maintain cover.'

51.   In the course of obeying her Chief's orders, it was impossible to maintain any semblance of modesty and was regularly forced to expose herself in front of her colleagues.

52.   Each "bachelor party" sting began with the male supervisors pressuring the females to take shots of hard alcohol "to loosen up" and "have a good time."

53.   Despite her and other female deputies protesting and objecting to this assignment and operation, the male deputies in supervisory roles instructed Jane Does 1,

2, and 3 that if the women wanted to be in the human trafficking division, then they would need to comply with their unwanted sexual contact, sexual harassment, and sexual ridicule.

54.     The Deputy Plaintiffs were told they would need to be willing to do "whatever it takes to make the arrest." Despite that instruction, it was well understood in the unit that the "bachelor parties" had nothing to do with arrests, and merely focused Chief Gore and Lt. Rigdon having a good time. On one operation, Chief Gore was photographed in his underwear, drink in hand, watching two other deputies wrestle and play with a 'dildo' trying to shove it in each others' pants.

55.     While McKinney's experience in the undercover bachelor party stings was gruesome and gut-wrenching in its own right, her most horrifying experience came from yet another HCCO-1 operation overseen and approved by Constable Alan Rosen.

56.     On the morning of August 22nd, 2019, McKinney and another deputy were ordered to drop everything they were doing to come to Chief Gore's office for a meeting. In the meeting, they were told that Alan Rosen's Chief of Staff was sexually assaulted at a massage parlor and that Alan Rosen wanted HCCO-1 Human Trafficking Unit to send undercover females into the establishment.

57.     McKinney was ordered to enter the parlor in an undercover capacity *and wait to be sexually assaulted* to give the raid signal. When McKinney asked why they would need to be assaulted, they were told "the boss says we have to do this op." "The boss" refers to Alan Rosen. There was already sufficient evidence to make an arrest prior to exposing McKinney to this trauma.

58.     McKinney was ordered to make an appointment at the establishment with the known sexual deviant. At said appointment she was, unsurprisingly, penetrated in both her vagina and anus by the same individual who had only days before assaulted the HCCO-1 staff member. McKinney was forced to allow this to happen as she was *ordered* to do by her superiors. In order to appease HCCO-1 supervisors and comply with orders, McKinney was sent in to *disrobe with a known rapist,* like a lamb to the slaughter, and allow him to assault her. Only after the assault was she ordered to give the 'bust' signal so that an arrest could be made.

59.     Immediately after being assaulted at the behest of HCCO-1, McKinney emerged from the establishment to see Constable Alan Rosen, his media director, and news crews assembling for a press conference. Constable Rosen told Channel 2 news afterwards that "[i]t was very important to me that we move very quickly on this case because of the victim's outcry," ratifying the operation.[2]

60.     Though she was a victim of an unwanted sexual assault, she was treated by HCCO-1 as nothing more than a tool. She was not important enough to be concerned over what she experienced, her feelings, or the fact that she was now a victim like those she wanted so badly to help.

61.     Instead, McKinney was seen to be fodder for a headline arrest. From the moment she walked out, she was all but ignored.

---

[2] *New Masseur at Massage Heights Accused of Sexually Assaulting Woman During Session,*
(https://www.click2houston.com/news/2019/08/22/new-masseur-at-massage-heights-accused-of-sexually-assaulting-woman-during-session/)

62.     McKinney drove herself to her SANE (sexual assault) exam, was ordered to call the district attorney to accept her own sexual assault charges while holding back tears, and has since sought the care of a therapist and trauma specialist.  In any situation where a deputy is sent to the hospital with injuries, Alan Rosen has always made it a point to visit them in a showing of support.  In Felecia McKinney's circumstance, she was forced to drive herself and was abandoned by her department, her Constable, and her County

63.     There can be no excuse for willingly offering up this woman to sacrifice herself simply to make a headline and news story. The leadership at HCCO-1 viewed these young officers as mere playthings, sex objects, and disposable props.  Constable Rosen, months later, told the Houston Chronicle that Felecia McKinney "do[es] the job knowing of that danger."

## E.     Jacquelyn Aluotto: The Whistleblower

64.     Jacquelyn Aluotto was hired as a human trafficking advocate with Harris County Constable's Office Precinct 1 ("HCCO-1") in January of 2019.

65.     Aluotto worked closely as an employee with the entire Human Trafficking division. Her goal, job description, and background were to give women who had been trafficked the care and resources to help them recover and also to allow HCCO-1 to use them as cooperating witnesses against traffickers.

66.     Aluotto is nationally renowned for this work and has been given multiple awards for her work from local, state, and national organizations as well as the United Nations. She made a career and passion of speaking up, serving, and fighting for exploited women and children who cannot speak for themselves.  This case is no different.

14

67.     Shortly after joining the team, Aluotto realized that Chief Gore and the division were devoting almost no energy or resources to solving cases, giving victims care, following up with trafficked children, or making high-up-the-chain arrests. Instead, nearly all of the unit's energy went into the planning of the aforementioned "bachelor party" stings at Gore's pleasure.

68.     It was clear that not only did Chief Gore and Lt. Rigdon not focus on care for trafficking victims, but they actually did also not focus on solving cases at all.

69.     The focus all went to which male supervisor was "given" which female partner, who was to provide the liquor, and planning the next sting so that everyone could "loosen up and have fun."

70.     On one sting, Aluotto and Gore's female "undercover partner" were interviewing a minor trafficking victim after an arrest was made. Chief Gore burst into the room, intoxicated from the evening's festivities, and pulls his "partner" out of the interview in the middle of the child's outcry before anything of substance was conveyed by the minor victim. Tired and intoxicated, Gore had his fun and was ready to leave.  He demanded the minor female trafficking victim 'hurry up' with her statement and began to yell at her. He did not care about the law enforcement work to be done.

71.     Gore later commanded his "undercover partner" to swear in an arrest warrant affidavit that she *was* present in the interview and received information directly from the minor victim, despite the fact that Gore ordered her out of the room.

72.    It became increasingly clear to Aluotto that in addition to the criminal
conduct by law enforcement above, these female deputies were being victimized and
exploited themselves as sexual objects by their own supervisors.

73.    As a result of Chief Gore refusing to focus the division on solving cases or
following up with trafficking victims, victims went missing, ceased cooperating with
investigations, and cases otherwise fell apart.

74.    Aluotto spoke up to her chain of command and was quickly shut down. This
included direct conversations with and complaints made to Constable Alan Rosen.

75.    In January 2020, Aluotto confronted Constable Alan Rosen about Chief
Gore's inappropriate activities, including his exploitation of his subordinate officers while
using these operations for his own sexual gratification.

76.    Aluotto made it clear that Chief Gore was hiring young, inexperienced
officers and forcing them into inappropriate situations. Constable Rosen told Aluotto he
would address the issue. Constable Rosen responded that he would speak with him but that
Chief Gore could be "trusted."

77.    Nonetheless, the operations continued with Constable Alan Rosen's blessing.

78.    Around this time, Chief of Staff Erica Davis told Aluotto that she needed to
stop telling the Constable these things directly *because that would make him liable*."
Aluotto then went to another Captain in the department to discuss the matter. Later that
day, Erica Davis called Aluotto yelling and said "the Constable and I spoke, we are going
to handle it. We don't want other people knowing about it."

79.    Nonetheless, the operations continued.

80.    In April of 2020, Ms. Aluotto complained via email to Chief Gore, Lt. Rigdon, Erica Davis, and Constable Alan Rosen that protocol for helping human trafficking victims was not being followed.  She threatened to "CC" the District Attorney's Office in emails.  Two hours later, she was removed from the Human Trafficking Unit altogether and transferred from the human trafficking division to 'community outreach' and her human trafficking phone and laptop were demanded from her.  Her job description in her new assignment was vague and nondescript, and she was inexplicably *prohibited* from and warned against contacting the human trafficking victims who had come to rely upon her.

81.    In July 2020, Ms. Aluotto took her concerns to Johna Stallings, head of the Sex Crimes Division at the Harris County District Attorney's Office. After no action was taken for several months, Ms. Aluotto told Ms. Stallings that action needed to be taken or Ms. Aluotto would seek relief elsewhere.

82.    Ms. Stallings eventually interviewed some of the female deputies, after which she agreed with Ms. Aluotto that the problem needed to be addressed, and HCCO-1's human trafficking division needed oversight and change.  She questioned whether Gore's actions, sanctioned by Constable Alan Rosen, were criminal.

83.    Nonetheless, months passed with no action. Ms. Aluotto was eventually told by Ms. Stallings in November (after the 2020 election) that the information had been given to Harris County District Attorney Kim Ogg, and that Ms. Ogg was unwilling to initiate an investigation into Alan Rosen's office despite the reported conduct. The Harris County District Attorney's Office referred the matter to be handled internally at HCCO-1.

84.     After election day, Ms. Aluotto was finally contacted by HCCO-1 internal affairs to set up an interview for an 'administrative investigation.'

85.     Ms. Aluotto gave a three-hour videotaped interview at HCCO-1 internal affairs. During the interview, she disclosed the rampant harassment, sexual assault, retaliation, and bullying in the unit, as well as falsified documents, intoxication of commanding officers, and molestation of subordinates.

86.     Ms. Aluotto disclosed how the young female deputies suffered emotional breakdowns from their molestation, and how they were quietly moved to less prestigious duties when they complained.

87.     The following day, pursuant to the custom and practice of HCCO-1's Human Trafficking Division of silencing those who spoke up and pursuant to Alan Rosen's command, Ms. Aluotto's hours were cut to zero thereby terminating her employment. She was, like all that came before her, finally silenced. Or so they thought.

## COUNT ONE
### Sexual Harassment through 42 U.S.C. §1983
### The Deputy Plaintiffs against Defendants Rosen, Gore, and Rigdon

88.     Plaintiffs adopt, reallege, and incorporate all preceding and subsequent paragraphs.

89.     Defendants Rosen, Gore, Rigdon have violated Plaintiffs' rights under the Equal Protection clause of the Fourteenth Amendment through sexual harassment.

90.     Plaintiffs belong to a protected group as they are female.

91.     Defendants Rosen, Gore, and Rigdon had authority over Plaintiffs, and they were acting under color of law at all relevant times.

92.     Plaintiffs have been discriminated against and treated differently than similarly-situated male employees solely because of their gender.

93.     Due to the actions of Defendants Rosen, Gore, and Rigdon, Plaintiffs were subjected to a hostile work environment in which they were targeted for sexual abuse, denigration, and exploitation.

94.     Plaintiffs were subjected to unwelcome sexual harassment, as described above.

95.     Defendant Gore directly harassed the Plaintiffs.

96.     Defendant Rigdon actively assisted Defendant Gore in concealing the illegal treatment of the Plaintiffs.

97.     Defendant Rosen created and oversaw the "bachelor party" unit which subjected untrained subordinate officers to sexual contact from their commanding officers. Defendant Rosen further ratified Defendant Gore's actions in subjecting employees to abusive, traumatic, and harassing work environments.

98.     Defendant Rosen refused to take proper remedial actions when complaints were raised about the hostile work environment created in the Human Trafficking Unit.

99.     Plaintiffs objected to Defendant Gore's misconduct, including his unwelcome sexual advances and molestation.

19

100.    The harassment suffered by the Plaintiffs was sufficiently severe or pervasive to alter the terms and conditions of their employment and create a discriminatorily abusive working environment.

101.    In addition, Plaintiffs' complaints about their treatment were used by Defendant Gore as a basis for making employment decisions which affected the terms and conditions of Plaintiffs' employment.

102.    Refusing to endure Defendant Gore's disgusting actions resulted in adverse employment actions.

103.    The unlawful conduct of the Defendants as described above was done with intent, malice and/or reckless disregard and/or deliberate indifference to Plaintiffs federally protected rights.

104.    As a proximate result, Plaintiffs have suffered extreme harm including, but not limited to, injury including pain, humiliation, mental anguish and suffering.

**COUNT TWO**
**Sexual Harassment through 42 U.S.C. §1983**
**The Deputy Plaintiffs against Defendant Harris County**

105.    Plaintiffs adopt, reallege, and incorporate all preceding and subsequent paragraphs.

106.    Defendant Harris County has violated Plaintiffs' rights under the Equal Protection clause of the Fourteenth Amendment through sexual harassment.

107.    Harris County, through Defendant and policymaker Alan Rosen, had a policy or custom of subjecting young, vulnerable, untrained deputies to traumatic undercover

"bachelor party" stings in which they were subject to groping, molestation, and unwanted sexual contact by their commanding officers.

108.    Defendant Rosen, acting a final policymaker for Defendant Harris County, intentionally approved and oversaw the operational concept in which in subordinate officers would be forced into inappropriate sexual situations involving their commanding officers.    In doing so, Defendant Rosen showed deliberate indifference for the constitutional injuries that would obviously result from this environment.

109.    Harris County, through Defendant Rosen, had a policy or custom of failing to adopt adequate procedures ensuring that these sexually-charged, unorthodox, and potentially traumatic "bachelor party" sex crimes operations were staffed by officers who had been adequately trained in undercover tactics and who had been adequately prepared to engage in the unusual duties. Instead, in Constable Alan Rosen's official policies for *Covert Operations and Investigations* (Policy #531), "Officer selection criteria for the covert (clandestine) investigators will be made at the discretion of the Investigative Unit Commander." The Investigative Unit commander was Assistant Chief Chris Gore. As discussed above, Defendant Gore specifically selected young, inexperienced women he found attractive, and they were provided no specialized training for the assaults that would occur.

110.    Not only did Constable Rosen fail to adopt policies to ensure properly trained officers were selected for these operations, but he fully approved of the nature of the operations and the nature of Defendant Gore's personnel choices. Constable Rosen also personally witnessed the personnel present during the "bachelor party" stings. Constable

21

Rosen had actual knowledge that young, inexperienced, and potentially vulnerable officers were serving in these unorthodox roles, heightening his understanding for the need to ensure that these officers were properly trained, supervised, and protected.

111. Harris County, through Defendant Rosen and other policymakers, failed to train its undercover sex crimes officers in specific skills needed to handle recurring situations which arise in the unique nature of the particular assignment, thus presenting an obvious potential for constitutional violations. Throughout Constable Rosen's official policies for *Covert Operations and Investigations* (Policy #531), the need for specialized training, unique rules, and individual protocols is emphasized for the various types of operations conducted by undercover officers. The rules and regulations for a large variety of tactical operations are described in detail, but there are no rules and regulations concerning Constable Rosen's "bachelor party" stings.

112. Constable Rosen's official policies for *Covert Operations and Investigations* (Policy #531) contains specific protocols and rules regarding:

    i. Protocols for operations in sexually oriented businesses, such as massage parlors, adult video arcades, and adult cabarets. In these operations, an undercover officer will pose as a customer.

    ii. Protocols for operations in gambling and game rooms. In these operations, an undercover officer will pose as a gambler.

    iii. Protocols for stings of sex workers "moving either on foot or by vehicle."

    iv. Protocols for "Out Call" hotel operations, in which a potential customer is lured to a hotel to be arrested by a single undercover officer posing as a sex worker, supported by a tactical arrest team.

     v. Protocols for "In Call" operations, in which an undercover officer poses as a customer and travels to a location used by a sex worker.

     vi. Protocols for surveillance activities, in which undercover officers will collect intelligence on a dangerous location or individual.

     vii. Protocols for consensual searches, known as "knock-and-talks," in which officers will attempt question subjects at a dangerous location.

     viii. Protocols for "Clean Buys," in which contraband is purchased by an undercover officer for the purpose of gathering intelligence.

     ix. Protocols for "Dirty Buys," in which contraband is purchased by a confidential informant under supervision for the purpose of gathering intelligence.

     x. Protocols for "Buy Busts," in which an undercover officer takes delivery of contraband with the intention of making an immediate arrest.

     xi. Protocols for search warrants, in which officers enter a potentially dangerous location under court order.

     xii. Protocols for operations involving "flash funds," which is the display of cash by an undercover officer in front of criminal subjects during an operation.

113. The existence of detailed protocols for each of these undercover activities recognizes the need to set guidelines required to handle recurring situations which arise in the unusual nature of the specific operations.

114. However, Harris County, through Defendant Rosen and other policymakers, failed to properly develop and implement protocols for his "bachelor party" operations.

115. Harris County, through Defendant Rosen and other policymakers, failed to adopt policies to ensure that supervisory officers were not exploiting the unique

circumstances of these "bachelor party" operations to harass, abuse, or traumatize their subordinate officers.

116.  For example, in Constable Rosen's formal policies, there are many rules and protocols regarding the potential for sexually-charged contact between undercover officers and the targets of their investigations. However, none of the policies address the potential for sexually-charged contact between subordinate officers *and their supervisors*, as called for and mandated in these "bachelor party" stings. By failing to adopt formal policies and training on this topic Defendant Harris County, through Defendant Rosen and other policymakers, acted with deliberate indifference, ultimately inviting these kinds of constitutional violations as a result of Constable Rosen's unorthodox "bachelor party" stings.

117.  In typical sex crimes operations, undercover officers are protected from unwanted sexual contact, and specific protocols exist concerning sexual conduct. For example, Constable Rosen's official policies for *Covert Operations and Investigations* (Policy #531) recognizes that "the suspects involved may attempt to try to make sexual contact with the covert officer," and that "when this occurs," the officer will "[d]o what he / she can do to break contact as soon as possible," and will only "remain in a covert status" when "it is a life or death situation." Constable Rosen did not provide any protocols governing sexually-charged contact between subordinate officers and their commanding officers during these "bachelor party" stings.

118.  Harris County, through Defendant Rosen and other policymakers, had a policy or custom of failing to adopt and disseminate adequate policies ensuring the physical

safety and psychological well-being of law enforcement officers ordered to participate in potentially traumatic "bachelor party" operations. Harris County, through Defendant Rosen and other policymakers, failed to adopt policies to ensure that subordinate officers were psychologically and professionally prepared to engage in undercover "bachelor party" operations, including an understanding of their rights.

119. Even typical sex crimes operations require training, protocols, and psychological safeguards. Yet Constable Rosen's "bachelor party" operations were very different than the sex crimes operations previously conducted by the unit. In most operations, the undercover officer is vulnerable to the investigation's target, but has a measure of safety and predictability from her back-up officers. In Constable Rosen's "bachelor party" stings, the undercover officers had to balance the difficult psychological pressures of undercover work and sexual vulnerability with the authority of the officer's supervisor. Even under the best of circumstances and most noble of intentions, these operations, if not properly planned, staffed, and monitored, would obviously produce these kinds of the constitutional violations.

120. The Plaintiffs were required by formal policy to obey orders from their superiors, and Assistant Chief Gore was able provide just enough pre-text to cloak his improper actions and harassment in a law enforcement purpose. In the absence of formal policies, training, and supervision of these highly orthodox operations, the ambiguity was predictably exploited by Assistant Chief Gore, Lt. Shane Rigdon, and other supervisors, resulting in a hostile work environment.

121. Furthermore, Harris County, through Defendant Rosen and other policymakers, failed to adopt policies to monitor and safeguard the well-being of subordinate female officers involved in these unorthodox "bachelor party" operations. Harris County's failure to ensure training and psychological precautions to these undercover officers would have been mitigated if Harris County had adopted to policies to ensure that a neutral advocate was monitoring the well-being of undercover officers placed in this vulnerable position.

122. Harris County, through Defendant Rosen and other policymakers, failed to adopt policies to ensure that sensitive and potentially traumatic "bachelor party" sex crimes operations were properly monitored, supervised, and reviewed to ensure the safety and well-being of all participants. Given that Defendant Rosen created a sex crimes operation in which young subordinate officers would be required to engage in sexually-charged conduct and contact with their commanding officers, he should have known that specialized monitoring and supervision of the operations was required.

123. In the alternative, Harris County, through Defendant Rosen and other policymakers acted with deliberate indifference as a matter of law by creating a sex crimes operation in which young subordinate officers would be required to engage in sexually-charged conduct and contact with their commanding officers. Such a policy is outrageous, shocks the conscience, and is obviously inviting the kind of constitutional violations seen in this case.

124. Harris County, through Defendant Rosen and other policymakers, had a policy of allowing supervising and subordinate officers to become intoxicated during

undercover "bachelor party" operations, or had a custom of failing to adopt policies to ensure that supervising and subordinate officers were not becoming intoxicated during undercover sex crimes operations. According to Constable Rosen's official policies for Covert Operations and Investigations (Policy #531), "Convert [sic] (Clandestine) Investigators, with approval, may only consume one (1) alcoholic beverage per hour during the investigation, not to exceed two (2) alcoholic beverages." However, this policy does not represent the actual custom and practice of the HCCO-1 Human Trafficking Unit as overseen by Constable Rosen. The unit consumed liquor in abundance, and it spent taxpayer funds to do so. The widespread custom and practice of HCCO-1 "bachelor party" stings was a party environment in which supervising officers were consistently intoxicated." The use of alcohol to intoxication was a well-understood and widespread practice in HCCO-1 of which Constable Rosen was actually aware.

125.    Given the potential trauma and unique opportunities for abuse posed by these unorthodox "bachelor party" operations, the Plaintiffs' injuries are a highly predictable or plainly obvious consequence of Harris County's policies and customs.

126.    In light of the unorthodox duties assigned to these supervising and subordinate officers by Defendant Rosen, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that Defendant Rosen and other policymakers of Harris County have shown themselves to be deliberately indifferent to the likelihood of the kinds of injuries and misconduct seen in this case.

127.    These policies and customs described above were either official policies or decisions promulgated and adopted by the county, through Defendant Rosen and other policymakers, or unofficial patterns of widespread practice enacted by Defendant Rosen and other policymakers.

128.    Defendant Harris County, through Defendant Rosen, failed to take appropriate remedial action upon receiving complaints of the misconduct occurring in the "bachelor party" stings.  Defendant Rosen is the final policymaker concerning HCCO-1 and its Human Trafficking Unit and failed to take remedial action subsequent to the Deputy Plaintiffs' injuries.

129.    The failure of the County and its final policymakers to take action establishes that the actions complained of were the result of the county's policies or customs. These subsequent acts by Harris County and its final policymakers demonstrate the existence of the custom and policies that caused the prior unconstitutional action.

130.    There is a direct causal link between the injuries alleged by Plaintiffs and Harris County's policies and customs as described above.

131.    In addition, Harris County also ratified the hostile and abusive behavior. Defendant Rosen, Constable at HCCO-1, is the final policymaker as it concerns the operations of the HCCO-1 Human Trafficking Unit. Defendant Rosen intentionally created and oversaw a new type of operation in which subordinate officers would be subject to sexual contact with their commanding officers, and he intentionally allowed his Assistant Chief to staff this new operation with young, vulnerable officers, while providing them no specialized training or protection. Furthermore, despite Defendant Rosen's actual,

contemporaneous knowledge throughout these events of the specific misconduct of Defendants Gore and Rigdon, Defendant Rosen took no action to cease their egregious misconduct, ratifying their acts.

132. Defendant Rosen understood the outrageous nature of his "bachelor party" unit from the start, having personally observed its set-up, personnel, and operation. Defendant Rosen actively ratified and oversaw those operations.

133. Defendant Rosen was also provided actual notice about the misconduct occurring in the "bachelor party" stings from multiple sources throughout the time of its operation, including complaints by the Deputy Plaintiffs and the Whistleblower Plaintiff, as well as others.

134. There is a direct causal link between the injuries alleged by Plaintiffs and Harris County's ratification of the offensive conduct.

135. Harris County was grossly negligent in failing to prevent and promptly correct the sexually harassing behavior.

136. Harris County was grossly negligent in failing to have sufficient anti-harassment policies in place and did not widely disseminate or vigorously enforce any anti-harassment policy it may have had.

137. Harris County was grossly negligent in failing to guard against this misconduct and in failing to take adequate remedial action.

138. Harris County was aware of the hostile and abusive environment, and it refused to correct the situation.

Case 4:21-cv-01698 Document 1 Filed on 05/24/21 in TXSD Page 30 of 40

139.     The unlawful conduct of Harris County as described above was done with intent, malice and/or reckless disregard and/or deliberate indifference to Plaintiffs' federally protected rights.

140.     The harassment Plaintiffs suffered was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.

141.     As a proximate result, Plaintiffs have suffered extreme harm including, but not limited to, injury including pain, humiliation, mental anguish and suffering.

**COUNT THREE**
**Sexual Battery through 42 U.S.C. §1983**
**The Deputy Plaintiffs against Defendant Gore**

142.     Plaintiffs adopt, reallege, and incorporate all preceding and subsequent paragraphs.

143.     Defendants Gore has violated Plaintiffs' rights under the Due Process clause of the Fourteenth Amendment through sexual battery, thus violating their bodily integrity.

144.     Defendant Gore, acting within the course and scope of his employment, intentionally caused the touching of, or application of force to, the bodies of the Plaintiffs, in a harmful, offensive, and sexual manner, without their consent.

145.     Defendant Gore also intentionally attempted or threatened to inflict harmful, offensive, and sexual contact on the Plaintiffs' bodies. This conduct, coupled with his apparent ability to cause harm upon the Plaintiffs, created a reasonable apprehension of bodily harm or offensive conduct on the part of the Plaintiffs.

146.   Defendant Gore could not have assaulted the Plaintiffs absent his authority as an agent for the State.

147.   As a proximate result, Plaintiffs have suffered extreme harm including, but not limited to, injury including pain, humiliation, mental anguish and suffering.

**COUNT FOUR**
**Sexual Battery through 42 U.S.C. §1983**
**The Deputy Plaintiffs against Defendant Harris County**

148.   Plaintiffs adopt, reallege, and incorporate all preceding and subsequent paragraphs.

149.   Defendant Harris County has violated Plaintiffs' rights under the Due Process clause of the Fourteenth Amendment due to sexual battery, thus violating their bodily integrity.

150.   Defendant Gore could not have assaulted the Plaintiffs absent his authority as an agent for the State.

151.   Plaintiffs reported the assaults through multiple channels at HCCO-1, thereby taking advantage of corrective opportunities.

152.   The policies and customs of Defendant Harris County, described above, as enacted through Defendant Rosen and other policymakers, showed deliberate indifference towards the probability of an offensive sexual battery in violation of Plaintiffs' federally protected rights.

153.   The policies and customs of Defendant Harris County, described above, as enacted through Defendant Rosen and other policymakers, was a proximate cause of the sexual battery suffered by Plaintiffs. The policies and customs of Defendant Harris County

which caused a hostile work environment likewise caused the sexual batteries by Chief Gore.

154. Defendant Harris County, through Defendant Rosen, received subsequent complaints of the sexual batteries, and it refused to correct the situation. These subsequent acts demonstrate the existence of the policies or customs, described above, which caused the prior constitutional violations.

155. In addition, Defendant Harris County, through Defendant Rosen and other policymakers, ratified the sexual batteries. Defendant Rosen created and oversaw the "bachelor party" operations knowing the subordinate officers would be subjected to offensive sexual contact from their commanding officers. Throughout the operations, Defendant Rosen was actually aware that offensive and harmful sexual batteries were occurring.

156. The unlawful conduct of Harris County as described above was done with intent, malice and/or reckless disregard and/or deliberate indifference to Plaintiffs' federally protected rights.

157. The harassment Plaintiffs suffered was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.

158. As a proximate result, Plaintiffs have suffered extreme harm including, but not limited to, injury including pain, humiliation, mental anguish and suffering.

## COUNT FIVE
### Sexual Battery through 42 U.S.C. §1983
### Felecia McKinney against Defendant Rosen, Gore, and Rigdon
### (Massage Parlor Incident)

159.    Plaintiff Felecia McKinney adopts, realleges, and incorporates all preceding and subsequent paragraphs.

160.    Defendant Rosen has violated McKinney's rights under the Due Process clause of the Fourteenth Amendment due to sexual battery, violating her bodily integrity.

161.    As described above, Defendant Rosen ordered an operation in which Felecia McKinney was sent into a massage parlor with the express intention of having her be sexually assaulted by a suspected rapist.

162.    McKinney was ordered to suffer this sexual assault.

163.    Defendant Rosen maliciously and callously exposed McKinney to this assault with the intent that she be assaulted so that a public arrest could be made.

164.    Defendant Rosen could not have ordered the sexual assault of McKinney absent his authority as an agent for the State.

165.    As a proximate result, Felecia McKinney has suffered extreme harm including, but not limited to, injury including pain, humiliation, mental anguish and suffering.

## COUNT SIX
### Sexual Battery through 42 U.S.C. §1983
### Felecia McKinney against Defendant Harris County
### (Massage Parlor Incident)

166.    Plaintiff Felecia McKinney adopts, realleges, and incorporates all preceding and subsequent paragraphs.

33

167. Defendant Harris County has violated McKinney's rights under the Due Process clause of the Fourteenth Amendment due to sexual battery, thus violating her bodily integrity.

168. Harris County, through its final policymaker Defendant Rosen, failed to ensure the physical safety and psychological well-being of McKinney while she was ordered to conduct an undercover investigation and arrest of a suspected rapist.

169. Harris County, through its final policymaker Defendant Rosen, intentionally subjected to McKinney to a disturbing sexual assault.

170. In typical sex crimes operations, undercover officers are protected from unwanted sexual contact, and specific protocols exist concerning sexual conduct. For example, Constable Rosen's official policies for Covert Operations and Investigations (Policy #531) recognizes that "the suspects involved may attempt to try to make sexual contact with the covert officer," and that "when this occurs," the officer will "[d]o what he / she can do to break contact as soon as possible," and will only "remain in a covert status" when "it is a life or death situation." Officers are instructed to avoid and prevent sexual contact, and they are instructed to take reasonable steps to avert the possibility of sexual acts.

171. However, Defendant Rosen, acting as final policymaker for Harris County, ordered an operation in which it was intended that McKinney would suffer a sexual assault. In doing so, Defendant Rosen intentionally violated McKinney's federally protected rights.

172. Furthermore, Harris County, through Defendant Rosen, failed to ensure that Felecia McKinney was psychologically and professionally prepared to engage in such an operation, including an understanding of her rights.

173. Given the trauma likely to be suffered by an undercover officer ordered to endure a sexual assault, McKinney's injuries are a highly predictable or plainly obvious consequence of Defendant Rosen's actions as final policymaker for Harris County.

174. There is a direct causal link between the injuries alleged by McKinney and Harris County's actions as described above.

175. The unlawful conduct of Harris County as described above was done with intent, malice and/or reckless disregard and/or deliberate indifference to McKinney's federally protected rights.

176. As a proximate result, McKinney has suffered extreme harm including, but not limited to, injury including pain, humiliation, mental anguish and suffering.

## COUNT SEVEN
### Violation of Equal Protection by Loss of Bodily Integrity through 42 U.S.C. §1983
### The Deputy Plaintiffs against Defendant Harris County

177. Plaintiffs adopt, reallege, and incorporate all preceding and subsequent paragraphs.

178. Plaintiffs had the right to bodily integrity, which is a substantive due process right.

179. Due to the policies, customs, and direct intentional actions of Harris County described above, Plaintiffs suffered unconstitutional invasions of their bodily integrity

under color of state law. Those policies, customs, and intentional acts showed a deliberate indifference to this type of constitutional injury.

180. These invasions of Plaintiffs' bodily integrity would not have occurred but for the policies, customs, and intentional acts of Defendant Harris County, described above, as implemented, ratified, and overseen by Constable Rosen. Defendant Harris County's acts and omissions described above were a proximate cause of the Plaintiffs' loss of bodily integrity.

181. In addition, Defendant Harris County, through Defendant Rosen and other policymakers, ratified the invasion of Plaintiffs' bodily integrity, as described above.

182. The loss of bodily integrity suffered by Plaintiffs was sufficiently severe to violate Plaintiffs' right to equal protection under the law.

183. As a proximate result, Plaintiffs have suffered extreme harm including, but not limited to, injury including pain, humiliation, mental anguish and suffering.

## COUNT EIGHT
### Retaliation through 42 U.S.C. §1983
### The Deputy Plaintiffs against Defendant Harris County

184. Plaintiffs adopt, reallege, and incorporate all preceding and subsequent paragraphs.

185. Plaintiffs engaged in statutorily protected conduct and speech of a matter of public concern for Harris County. Plaintiffs suffered sexual harassment and sexual assault which they reported through proper channels at HCCO-1.

186.     As a direct and proximate result of Plaintiffs' complaining activities, Plaintiffs have suffered materially adverse employment actions, including ridicule, denigrations, harassment, threats of additional undercover operations in which they would be abused, and transfer out of the human trafficking unit to less prestigious positions.

187.     Plaintiffs' interest in commenting on the matters of public concern to Harris County outweighed the defendant's interest in promoting efficiency.

188.     Harris County was aware of Plaintiffs' protected conduct and there was a close temporal proximity between this awareness and the adverse employment which resulted.  Plaintiffs' protected speech was the cause in fact and motivation for said adverse employment action.

189.     Plaintiffs have been damaged as a result of the constitutional violations and deprived of their rights to Equal Protection for complaining about these violations.

190.     As a proximate result, Plaintiffs suffered extreme harm and injury including, but not limited to, loss of income, pain, inconvenience, embarrassment, humiliation, mental anguish and suffering.

**COUNT NINE**
**Retaliation through 42 U.S.C. §1983**
**Whistleblower Plaintiff against Defendant Harris County**

191.     Plaintiff Jacqueline Aluotto adopts, realleges, and incorporates all preceding and subsequent paragraphs.

192.     Plaintiff had a good faith, reasonable belief that Defendant Rosen, Defendant Gore, and Defendant Rigdon had engaged in sexual harassment and/or sexual battery.

193.    Plaintiff engaged in statutorily protected conduct and speech. After her complaints were ignored by her chain of command and rebuffed by the Harris County District Attorney's Office, Plaintiff made direct complaints of harassment, abuse, and other unlawful conduct to HCCO-1 Internal Affairs Division.

194.    The information Plaintiff reported to her chain of command, the District Attorney's Office, and HCCO-1 Internal Affairs were a matter of public concern to Harris County.

195.    Plaintiff was terminated the following day, an adverse employment decision.

196.    Plaintiff's interest in commenting on the matter of public concern outweighed the defendant's interest in promoting efficiency.

197.    Plaintiff's termination was causally related to her complaints of sexual harassment, abuse, and other unlawful conduct at HCCO-1.

198.    Harris County was aware of Plaintiffs' protected conduct and there was a close temporal proximity between this awareness and the adverse employment which resulted.

199.    Plaintiff has been damaged as a result of the constitutional violations and deprived of their rights to freedom of speech for complaining about these violations.

200.    As a proximate result, Plaintiff suffered extreme harm and injury including, but not limited to, loss of income, pain, inconvenience, embarrassment, humiliation, mental anguish and suffering.

## PRAYER

Plaintiff respectfully prays that this Court will assume jurisdiction of this action, and after trial, entered an Order requiring Defendants to pay Plaintiffs' nominal, actual, compensatory, and punitive damages. Plaintiffs further pray for such other and further relief and benefits as the cause of justice may require, including, but not limited to, an award of costs, attorney's fees and expenses incurred by this litigation.

### PLAINTIFFS DEMAND A TRIAL BY JURY

Respectfully submitted,

**THE AKERS FIRM, PLLC**

*/s/ Brock C. Akers*
Brock C. Akers
TBN: 00953250
*/s/ Cordt C. Akers*
Cordt C. Akers
TBN: 24080122
3401 Allen Parkway, Suite 101
Houston, TX 77019
Phone: (713) 877-2500
Fax:     (713) 583-8662
bca@akersfirm.com
cca@akersfirm.com

ATTORNEYS FOR FELECIA
McKINNEY and JACQUELYN
ALUOTTO

**FARRAR & BALL, LLP**

/s/ William R. Ogden
WILLIAM R. OGDEN
Texas State bar No. 24073531
Federal Bar No. 2202355
/s/ Mark Bankston
MARK BANKSTON
Texas State bar No. 24071066
117 Herkimer St.
Houston, TX 77008
713.221.8300 Telephone
713.221.8301 Fax
bill@fbtrial.com
mark@fbtrial.com

ATTORNEY FOR LIZ GOMEZ and
MARISSA SANCHEZ

United States District Court
Southern District of Texas
**ENTERED**
August 30, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LIZ GOMEZ | § | |
| and | § | |
| MARISSA SANCHEZ | § | |
| and | § | |
| FELECIA MCKINNEY, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:21-CV-01698 |
| | § | |
| HARRIS COUNTY | § | |
| and | § | |
| ALAN ROSEN | § | |
| and | § | |
| CHRIS GORE, *et al*, | § | |
| | § | |
| Defendants. | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

## I. INTRODUCTION

Before the Court are the several individual defendants', Constable Alan Rosen, Assistant Chief Chris Gore, and Lieutenant Shane Rigdon, motions to dismiss (DE's 16 and 17), and the plaintiffs', Liz Gomez, Marissa Sanchez, Felicia McKinney and Jassmine Huff, responses (DE's 24 and 25). The defendants' motions are brought pursuant to Federal Rule of Civil Procedure 12(b)(6), asserting that the plaintiffs cannot maintain their suit against the defendants under 42 U.S.C. § 1983 for alleged violations of the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the federal Constitution. After a careful review of the relevant pleadings, the motions, responses, and the applicable law, the Court determines that defendants Gore's and Rigdon's motion to dismiss should be DENIED and that defendant Rosen's motion to dismiss should be GRANTED.



## II.     FACTUAL BACKGROUND AND CONTENTIONS[1]

The plaintiffs assert that, under the supervision of Constable Alan Rosen, young female deputy constables were handpicked for "undercover operations" under the guise of legitimate police work and were sexually molested and traumatized by their male superior officers, including defendants Chief Chris Gore and Lieutenant Shane Rigdon. Together, they instructed the plaintiffs, subordinate deputy constables, to take part in Chief Gore's invention of "bachelor party stings" involving both Gore and Rigdon and the plaintiffs taking undercover roles. Constable Rosen was aware of the unit's objectives, activities, and results. Constable Rosen was also present during some of the operations. These stings involved the defendants issuing orders to the young female deputy plaintiffs to expose their bare breasts, buttocks, and genitalia "in order to maintain cover." Female deputies were ordered to expose themselves to their superior male deputies to create a "bachelor party" undercover environment. The female plaintiffs were continuously pressured to drink hard liquor to "loosen up."

With Constable Rosen's knowledge and blessing, the defendants engaged in touching, kissing, and fondling of the plaintiffs' bodies under "color of law" for no reason other than their own sexual gratification. If the plaintiffs did not remove their clothes voluntarily, at times the defendants would take off their shirts and bras and throw them across the room. After the target of the operation was either arrested or left, inappropriate conduct would resume, including comments about how the plaintiffs looked naked, laughing, and joking. The chief of the human sex trafficking unit, defendant Gore, also ordered his deputies not to include him in any offense reports on these

---

[1] The factual background presented is part of the plaintiffs' pleadings and arguments presented to the Court in their response to the defendants' motions to dismiss. With exceptions, the Court presents the alleged facts as pled by the plaintiffs, which include the plaintiffs' contentions.

2

operations. Defendant Rigdon, another supervising officer, would then spend the following day deleting footage of this conduct.

After several of these operations, plaintiff McKinney was called into Gore's office and was told that Constable Rosen's chief of staff was sexually assaulted by a masseuse at a Massage Heights location and that McKinney was being ordered to go undercover with that same masseuse. She was then ordered by defendants Gore and Rigdon, at the behest of Constable Rosen, to make an appointment with this masseuse and wait to be sexually assaulted so she could make the bust signal and they could make an arrest. She was sexually assaulted at the massage parlor, and an arrest was made.

The plaintiffs have sued the defendants under section 1983, asserting that the defendants violated their rights under the Fourteenth Amendment's Equal Protection and Due Process clauses.

## III.   CONTENTIONS OF THE PARTIES

### A.   **Defendant Rosen**

In his motion to dismiss, Rosen asserts that the plaintiffs have failed to: (a) state an equal protection claim for sexual harassment; (b) assert a claim or present with specificity evidence that Rosen failed to train the officers allegedly involved; and (c) establish that he failed or refused to take proper remedial action when complaints were alleged; (d) establish that he ratified the alleged conduct of the defendants; (e) establish that he has supervisor liability based on claims against defendants Gore and Rigdon; (f) establish that McKinney has a "due process" claim against him for "sexual battery"; and (f) overcome the presumption that he is immune from suit as a public official.

### B.   **Defendants Gore and Rigdon**

Defendants Gore and Rigdon make, essentially, the same arguments as Rosen concerning the plaintiffs' claims. In addition, however, the defendants assert that; (a) they did not act under

3

"color of state law"; (b) neither of the defendants is an employer of the plaintiffs; and (c) there is

no due process claim for "sexual battery" under § 1983; (d) there is no pleading that Rigdon

subjected the plaintiffs to unwelcome sexual harassment or harassed any plaintiff; and (e) there

are no facts stating a claim of sexual harassment.

## IV.   STANDARDS OF REVIEW

### A.   Failure to State a Claim under Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) authorizes a defendant to move to dismiss for

"failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Under the

demanding strictures of a Rule 12(b)(6) motion, "[t]he plaintiff's complaint is to be construed in a

light most favorable to the plaintiff, and the allegations contained therein are to be taken as true."

*Oppenheimer v. Prudential Sec., Inc.*, 94 F.3d 189, 194 (5th Cir. 1996) (citing *Mitchell v. McBryde*,

944 F.2d 229, 230 (5th Cir. 1991)). Dismissal is appropriate only if the "[f]actual allegations [are

not] enough to raise a right to relief above the speculative level, on the assumption that all the

allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 555, 127 S. Ct. 1955, 1965, 167 L. Ed.2d 929 (2007). Moreover, in light of Federal Rule

of Civil Procedure 8(a)(2), "[s]pecific facts are not necessary; the [factual allegations] need only

'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." A

court's review is limited to the allegations in the complaint and to those documents attached to a

defendant's motion to dismiss to the extent that those documents are referred to in the complaint

and are central to the claims. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th

Cir. 2004).

### B.   Individual Liability under Section 1983

In order to state a claim against an individual government official under 42 U.S.C. § 1983,

a plaintiff must allege facts that indicate that the accused individual (a) actually participated in the

4

alleged wrongful act; (b) show how such conduct constituted a deprivation of a constitutional right, such as "due process" under the Fourteenth Amendment; and (c) establish that no reasonable official could have believed that his conduct was constitutional. *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005), *abrogated on other grounds, Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466, 192 L.Ed.2d 416 (2015).

## V.    ANALYSIS AND DISCUSSION

The Court is of the opinion that the factual allegations in the plaintiffs' First Amended Complaint, which the Court must take as true, are sufficient to state claims under Section 1983 against defendants Gore and Rigdon, individually. At this early stage, the Court concludes that the plaintiffs' allegations against defendants Gore and Rigdon are "enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964. However, the Court determines that the plaintiffs allege no facts that, if true, would support Rosen's individual liability under Section 1983. Accordingly, the plaintiff's claims against defendant Rosen, individually, must be dismissed.

## VI.    CONCLUSION

Based on the foregoing analysis and discussion, it is ORDERED that:

1. Defendants Chris Gore's and Shane Rigdon's motion to dismiss is DENIED; AND

2. Defendant Alan Rosen's motion to dismiss is GRANTED.

It is so ORDERED.

SIGNED on this 30th day of August, 2021.

Kenneth M. Hoyt
United States District Judge

5

**Andrew Grant**

| | |
|---|---|
| **From:** | Sandill, Kelly <KSandill@hunton.com> |
| **Sent:** | Tuesday, February 1, 2022 2:48 PM |
| **To:** | Bill Ogden |
| **Cc:** | Lewis, Ashley; Nommensen, Leah; Culbreth, Adrianna; Cordt Akers; bca@akersfirm.com; Scruggs, Gail; Andrew Grant |
| **Subject:** | Re: Gomez et al v. Harris County |

Yes; that works.

**Kelly Sandill**
Partner

**HUNTON ANDREWS KURTH LLP**
600 Travis Street, Suite 4200 | Houston, TX
77002 +1.713.220.4181 | ksandill@HuntonAK.com          vCard | Bio

On Feb 1, 2022, at 1:57 PM, Bill Ogden <bill@fbtrial.com> wrote:

Caution: This email originated from outside of the firm.

Kelly,

Following up on our call last week, are we in agreement on exchanging disclosures on 2/21?

Regards,

Bill Ogden, Partner
**Kaster Lynch Farrar & Ball**
1117 Herkimer St
Houston, TX 77008
713.221.8300 (p)
713.221.8301 (f)
bill@fbtrial.com

---

**From:** Sandill, Kelly <KSandill@hunton.com>
**Sent:** Thursday, January 27, 2022 8:58 AM
**To:** Bill Ogden <bill@fbtrial.com>
**Subject:** RE: Gomez et al v. Harris County



1

Bill – Turns out I have to judge moot court today until 12:30.  I thought t was only until 11.  Can we connect at 1 p.m.?



**Kelly Sandill**
Partner
kellysandill@HuntonAK.com
p  713.220.4181
bio | vCard

Hunton Andrews Kurth LLP
600 Travis Street
Suite 4200
Houston, TX 77002

HuntonAK.com

This communication is confidential. If you are not an intended recipient,
please advise by return email immediately and then delete this message,
including all copies and backups.

**From:** Bill Ogden <bill@fbtrial.com>
**Sent:** Wednesday, January 26, 2022 3:32 PM
**To:** Sandill, Kelly <KSandill@hunton.com>
**Subject:** Re: Gomez et al v. Harris County

Caution: This email originated from outside of the firm.

Yes that works.

Bill Ogden, Partner
Kaster Lynch Farrar & Ball LLP
1117 Herkimer st
Houston, TX 77008
713.221.8300 (Phone)
713.221.8301 (Fax)

**From:** Sandill, Kelly <KSandill@hunton.com>
**Sent:** Wednesday, January 26, 2022 12:37:46 PM
**To:** Bill Ogden <bill@fbtrial.com>
**Subject:** Re: Gomez et al v. Harris County

Can we put it on the calendar for 11 tomorrow? I don't want to get booked up and not be available.

**Kelly Sandill**
Partner

**HUNTON ANDREWS KURTH LLP**
600 Travis Street, Suite 4200 | Houston, TX
77002 +1.713.220.4181 | ksandill@HuntonAK.com          vCard | Bio

On Jan 26, 2022, at 12:31 PM, Bill Ogden <bill@fbtrial.com> wrote:

Caution: This email originated from outside of the firm.

My apologies for my confusion.  I will try back tomorrow.

Bill Ogden, Partner
Kaster Lynch Farrar & Ball LLP
1117 Herkimer st
Houston, TX 77008
713.221.8300 (Phone)
713.221.8301 (Fax)

**From:** Sandill, Kelly <KSandill@hunton.com>
**Sent:** Wednesday, January 26, 2022 11:42:28 AM
**To:** Bill Ogden <bill@fbtrial.com>
**Subject:** Re: Gomez et al v. Harris County

Bill,

I am tied up today. The times I offered were for tomorrow (Thursday).

Best,

Kelly


**Kelly Sandill**
Partner

**HUNTON ANDREWS KURTH LLP**
600 Travis Street, Suite 4200 | Houston, TX
77002 +1.713.220.4181 | ksandill@HuntonAK.com          vCard | Bio




On Jan 26, 2022, at 11:17 AM, Bill Ogden <bill@fbtrial.com> wrote:

Caution: This email originated from outside of the firm.

I just tried reaching you at your office. Please feel free to call me on my
cell 281-216-5338

3

Bill Ogden, Partner
Kaster Lynch Farrar & Ball LLP
1117 Herkimer st
Houston, TX 77008
713.221.8300 (Phone)
713.221.8301 (Fax)

**From:** Sandill, Kelly <KSandill@hunton.com>
**Sent:** Wednesday, January 26, 2022 8:23:05 AM
**To:** Bill Ogden <bill@fbtrial.com>
**Cc:** Cordt Akers <cca@akersfirm.com>; Brock Akers
<bca@akersfirm.com>
**Subject:** Re: Gomez et al v. Harris County

Bill-

Thanks for reaching out. I have some availability for a call tomorrow
between 11 a.m. and noon or or between 3 and 4 p.m.

Kind regards,

Kelly

**Kelly Sandill**
Partner

**HUNTON ANDREWS KURTH LLP**
600 Travis Street, Suite 4200 | Houston, TX
77002 +1.713.220.4181 | ksandill@HuntonAK.com          vCard
| Bio

On Jan 25, 2022, at 10:10 PM, Bill Ogden
<bill@fbtrial.com> wrote:

Caution: This email originated from outside of the firm.
Kelly,

Neal Sarkar, from the County Attorney's Office,
informed us that you will be defending this case. I'd like
to introduce myself and co-counsel in a brief telephone
conference at your convenience. It would also be wise
for us all to discuss a date to exchange initial

4

disclosures. When would be an acceptable time for us
to speak?

Regards,

Bill Ogden, Partner
Kaster Lynch Farrar & Ball LLP
1117 Herkimer st
Houston, TX 77008
713.221.8300 (Phone)
713.221.8301 (Fax)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **LIZ GOMEZ, et al.,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | **4:21-cv-01698** |
| **HARRIS COUNTY, TEXAS, et al.,** | § | |
| *Defendant.* | § | |

### DEFENDANT HARRIS COUNTY, TEXAS'S RULE 26(a)(1) DISCLOSURES

TO:     Plaintiffs Liz Gomez, Marissa Sanchez, Felicia McKinney, Jacquelyn Aluotto, and Jassmine Huff, by and through their attorneys of record, William R. Ogden, Kaster Lynch Farrar & Ball LLP, 1117 Herkimer Street, Houston, TX 77008, and Brock C. Akers and Cordt C. Akers, The Akers Firm, 3401 Allen Parkway, Suite 101, Houston, TX 77019

Pursuant to Rule 26(a)(1)(A) of the Federal Rules of Civil Procedure, Defendant

Harris County, Texas ("Harris County") discloses as follows:

**(1) The name and, if known, the address and telephone number of each individual likely to have discoverable information — along with the subjects of that information — that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.**

### RESPONSE:

1.  Liz Gomez
    Plaintiff
    c/o Plaintiffs' Attorney, William R. Ogden

    Ms. Gomez is a Plaintiff in this action and has information regarding the facts and events underlying her claims.

2.  Marissa Sanchez
    Plaintiff
    c/o Plaintiffs' Attorney, William R. Ogden

    Ms. Sanchez is a Plaintiff in this action and has information regarding the facts and events underlying her claims.



PLAINTIFF'S
EXHIBIT
4

3.  Felicia McKinney
    Plaintiff
    c/o Plaintiffs' Attorney, William R. Ogden

    Ms. McKinney is a Plaintiff in this action and has information regarding the facts and events underlying her claims.

4.  Jacquelyn Aluotto
    Plaintiff
    c/o Plaintiffs' Attorney, William R. Ogden

    Ms. Aluotto is a Plaintiff in this action and has information regarding the facts and events underlying her claims.

5.  Jassmine Huff
    Plaintiff
    c/o Plaintiffs' Attorney, William R. Ogden

    Ms. Huff is a Plaintiff in this action and has information regarding the facts and events underlying her claims.

6.  Christopher Gore, Assistant Chief, Harris County Constable's Office, Precinct 1
    c/o his Attorney, William S. Helfand
    Lewis Brisbois
    24 Greenway Plaza, Suite 1400,
    Houston, Texas 77046
    (713) 659-6767

    Chief Gore was previously a named Defendant in this action and has information regarding the allegations made against him in Plaintiffs' complaint.

7.  Shane Rigdon, Lieutenant, Harris County Constable's Office, Precinct 1
    c/o his Attorney William S. Helfand
    Lewis Brisbois
    24 Greenway Plaza, Suite 1400,
    Houston, Texas 77046
    (713) 659-6767

    Lt. Rigdon was previously a named Defendant in this action and has information regarding the allegations made against him in Plaintiffs' complaint.

8.  Constable Alan Rosen,
    Harris County Constable's Office, Pct 1
    c/o his Attorney William S. Helfand
    24 Greenway Plaza, Suite 1400

Houston, Texas 77046
(713) 659-6767

Constable Rosen was previously a named Defendant in this action and has information regarding the allegations made against him in Plaintiffs' complaint.

There may be additional persons currently or formerly affiliated with Harris County Constable's Office, Precinct 1 who have information that Harris County may use to support its claims or defenses concerning the allegations made in Plaintiffs' complaint. Harris County will supplement these disclosures to identify any such persons, and others, identified as discovery proceeds in this case.

Harris County incorporates by reference any individuals identified by Plaintiffs in their Rule 26(a) disclosures.

**(2) A copy — or a description by category and location — of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.**

**RESPONSE:**

Harris County is not aware of any such information in its possession, custody, or control at this time. Harris County reserves the right to amend or supplement its disclosure of documents as this case progresses.

**(3) A computation of each category of damages claimed by the disclosing party — who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.**

**RESPONSE:**

None. Harris County is not seeking damages at this time.

**(4) For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

**RESPONSE:**

None. Harris County is self-insured.

EMF_US 88725867                    -3-

Respectfully submitted,

_/s/ Kelly Sandill_
Kelly Sandill
State Bar No. 24033094
S.D.O.T. No. 38594
HUNTON ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas 77002
Telephone:  (713) 220-4181
Facsimile:  (713) 220-4285
_ksandill@huntonak.com_

ATTORNEY-IN-CHARGE FOR DEFENDANT
HARRIS COUNTY, TEXAS

OF COUNSEL:

Ashley S. Lewis
State Bar No. 24079415
S.D.O.T. No. 1457934
Leah Nommensen
State Bar No. 24101573
S.D.O.T. No. 3042052
Adrianna Culbreth
State Bar No. 24120785
S.D.O.T. No. 3696600
HUNTON ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas 77002
Telephone:  (713) 220-4200
Facsimile:  (713) 220-4285
_ashleylewis@huntonak.com_
_leahnommensen@huntonak.com_
_aculbreth@huntonak.com_

-AND-

Daniel N. Ramirez
MONTY & RAMIREZ LLP
State Bar No. 24039127
S.D.OT. No. 36213
Brittany G. Mortimer

State Bar No. 24084647
S.D.O.T. No. 2563723
150 W. Parker Road, 3rd Floor
Houston, TX 77076
Telephone: 281-493-5529
Facsimile: 281-493-5983
*dramirez@montyramirezlaw.com*
*bmortimer@montyramirezlaw.com*

-AND-

Neal A. Sarkar
Special Assistant County Attorney
State Bar No. 24093106
S.D.O.T. No. 2274036
Pam Rea
Assistant County Attorney
State Bar No. 00792790
S.D.O.T. 20799
Harris County Attorney's Office
1019 Congress, 15th Floor
Houston, Texas 77002
Telephone: (713) 274-5101
Facsimile: (713) 755-8924
*neal.sarkar@cao.hctx.net*
*pam.rea@cao.hctx.net*

## CERTIFICATE OF SERVICE

Pursuant to the written agreement of the parties' counsel dated February 17, 2022, I certify that a true and correct copy of the foregoing was served by email on February 21, 2022, as follows:

Bill Ogden
bill@fbtrial.com

Brock Akers
bca@akersfirm.com

Cort Akers
cca@akersfirm.com

*/s/ Kelly Sandill*
Kelly Sandill

20:29

Done **Under Cover Operation Pla...** 

CONFIDENTIAL DO NOT DISTRIBUTE



# HARRIS COUNTY CONSTABLES OFFICE PCT. 1
### Under Cover Operational Plan
### Operation Egypt
### October 17, 2019

**Location:** 425 North S. Houston Pkwy 77060                     **Date:** October 17, 2019

281-249-1234                                                          **Channel:** HCCO #1 Mental

**Time:** 3:00 pm                                                    **Key Map:** 490-A

**Nearest Hospital** Memorial Hermann Hospital Greater Heights  **Address: Phone#:** 1635 N Loop W

**Phone #:** 713-867-2000

**NOCC # EVENT: 13872          D-CODE: V95X**

**NOTIFICATION:** J. Moore

**Summary of Operation:** Harris County Constable's Office Precinct One Human Trafficking Unit, will conduct an undercover pro-active Prostitution operation at the **Hyatt Regency Houston Intercontinental located at 425 North Sam Houston Parkway East Houston, Texas 77060.**

**Divisions Involved in Operation: Primary:** Harris County Constable Precinct One Operations Support, Human Trafficking
**Secondary:** Harris County Constable Precinct One, Patrol, Juvenile Warrants Division and Environmental Division

**Vehicles Needed to Conduct Operation:** Uniformed Deputies with three (3) marked county vehicle(s) and undercover unmarked vehicles.

**Equipment/Resources Needed to Conduct Operation:**

1. Covert Audio equipment for recording the conversation between UC and suspect(s).

2. $ 3000.00 cash for the operation.

**Briefing Phase:** A briefing will be held at 2:00 pm, at the Harris County Precinct One Annex, located at 7300 North Shepherd Drive. During the briefing the goals of the operation will be discussed, undercover deputies will be identified, specific assignments will be assigned and any concerns of the operation will be discussed.

**Operation Details:**

We will have three designated rooms for this operation.
- **Room 1** will designated at the UC surveillance room: This room will be equipped with equipment that will allow all the audio and video recordings of Room 2 to be monitored. There will be a deputy assigned to monitor the live stream of the investigation in Room 2. In addition, the arrest team will stage in room 1.
- **Room 2** will be designated as the UC room: This room will be equipped audio and video equipment to record all activities inside the room. Upon contact the UC will attempt to make an appointment with the Suspect to come to the designated room at a designated time.
- **Room 3** will designated as the Interview room. Once the suspect has been arrested, the suspect will be transferred to Room 3. The arrested Suspects will be interviewed to ascertain if they are a Victim of Human trafficking.

There will be three Surveillance Teams:
- **Surveillance Team 1** – will be assigned to Room 1 and will monitor the covert cameras located in the Room 2 (UC room). The surveillance team 1 will listening for the designated arrest signal and will be responsible for notify the arrest team to enter Room 2 (UC Room) and make the arrests. In addition, surveillance team 1 will maintain radio contact and be the point of contact for the UC Rooms.
- **Surveillance Team 2** – will be assigned to conduct interior surveillance of the hotel lobby and the hotel entry and exit doors. Surveillance Team 2 will communicate any pertinent information via radio to Surveillance Team 1. Surveillance Team 2 will monitor the hotel lobby and the hotel entry and exit doors to ascertain if possible, if the target is alone and if applicable, who the target is with.
- **Surveillance Team 3** – will be assigned to conduct exterior surveillance of the hotel parking lot. Surveillance Team 3 will communicate any pertinent information via radio to Surveillance Team 1. And, if needed will communicate any pertinent information to the marked units. Surveillance Team 3 will monitor the hotel parking lot to ascertain if possible, how the target arrived; and if applicable who the target is with.

**Transport Unit/Marked Units Staging Location:**
- The parking lot located at 16800 Imperial Valley Drive, Houston, Texas.

**Under Cover Operation Details:**

This investigation will involve undercover officers (UC) making contact with females who advertise sexual services





This investigation will involve undercover officers (UC) making contact with females who advertise sexual services online. Upon contact the UC will attempt to make an appointment with the Suspect to come to the designated room at a designated time. This room will be equipped with audio and video equipment to record all activities inside the room.

Undercover Officers will make contact via telephone, text, or third party applications with individuals advertising sexual services online and attempt to schedule a meeting. Once the Individual arrives the UC will meet the target and attempt to get probable cause for Prostitution and/or other State Law Violations.

During this time the outside surveillance team will monitor the parking lot and immediate front entrance, surrounding areas and advise the Raid room supervisor of the arrival of the target and if alone or with another person. Raid room supervisor will advise UC of the arrival of the target.

Once the Suspect has arrived the UC will attempt to obtain probable cause for the arrest of the Suspect for prostitution and/or other crimes. Certain circumstances may arise in which the suspect or suspects questions or has doubts the UC in not a Peace Officer. In order to maintain the UC's status as an undercover officer, the UC may be required to remove his or her clothing and expose their nude body. The act of removing his or her clothing and exposing their nude body, includes, but is not limited exposing bare breast, bare buttocks, and bare genitalia.

Once the probable cause is established the UC will give the prearranged signal for the arrest team to enter the room and arrest the suspect. Once the arrest team enters the room, and arrests the suspect, the UC(s) will make an effort to cover his or her nude body.

**Days of Operation:**

   1. Thursday, 10-17-19 2 pm – TBD

**Visual Rip and Arrest Signal:**

**Audio Rip and Arrest Signal: "I need a shot!"**

**Text Signal:  Terminate Operation = 333**    **RIP = 666**    **Counter Surveillance = 999**

**Debriefing: TBA**

**Units Assigned to the Operation**

   1. Chief Chris Gore        8105
   2. Sergeant Shane Rigdon 8171
   3. Corporal Jon Moore      1H30
   4. Investigator Felicia Webb   1Z37
   5. Investigator Jassmine Huff  1Z35
   6. Investigator Marissa Sanchez1Z38
   7. Lieutenant Dale Hubert    8123
   8. Sergeant Andy Reyna      8174
   9. Aaron Harsha
  10. Deputy Casey Dobbins  1H20
  11. Sergeant Brad Geaslin 8170
  12. Deputy Frank Mena      1E35
  13. Deputy Gerald Cates     1E33
  14. Deputy Daniel Telles     1E36
  15. Deputy Jose Gonzalez  1E32
  16. Deputy Mark Salinas     1J25
  17. Deputy  Rose Demel      1J35
  18. Lieutenant Scales       8122
  19. Deputy Aaron Munoz     1E34
  20. Deputy Chris Koutsogannis 1J21
  21. Deputy Rudy Guillen     1S49
  22. Deputy Rafael Hubert       1N85
  23. Sergeant Carlos McClerkin  8138

**Duty Assignment**
- Undercover Units:
  - Chief Chris Gore Plain Clothes
  - Sergeant Shane Rigdon Plain Clothes
  - Corporal Jon Moore Plain Clothes
  - Investigator Felicia Webb Plain Clothes
  - Investigator Jassmine Huff Plain Clothes
  - Deputy Marissa Perez Plain Clothes
  - Deputy Gerald Cates Plain Clothes
  - Deputy Daniel Telles Plain Clothes
- Interior Surveillance:
  - Lieutenant Dale Hubert Plain Clothes
  - Sergeant Andy Reyna Plain Clothes
  - Aaron Harsha Plain Clothes
  - Deputy Rose Demel
- Exterior Surveillance:
  - Sergeant Brad Geaslin plain clothes unmarked vehicle
  - Deputy Frank Mena plain clothes unmarked vehicle
- Arrest/Evidence Team/Scene Photos:
  - Deputy Gerald Cates plain clothes with vest
  - Deputy Daniel Telles plain clothes with vest
  - Deputy Scott Barnett plain clothes with vest
- Processing/Initial Interviews/Suspect Photos:
  - Lieutenant Scales plain clothes with vest
  - Deputy Aaron Munoz plain clothes with vest

Plaintiff 001372

20:30



**Done** **Under Cover Operation Pla...**

- o Lieutenant Scales plain clothes with vest
- o Deputy Aaron Munoz plain clothes with vest
- o Deputy Jose Gonzalez plain clothes with vest
- Marked Uniformed Patrol Units:
  - o Sergeant Carlos McClerkin
  - o Deputy Rudy Guillen
  - o Deputy Rafael Hubert
- Ad/website communication
  - o Corporal Jon Moore
  - o Investigator Felicia Webb
  - o Investigator Jassmine Huff
- Transport/Booking Team
  - o Deputy Mark Salinas - unmarked vehicle with a cage
  - o Deputy Chris Kuotsogannis - unmarked vehicle with a cage
  - o Deputy Casey Dobbins - unmarked vehicle with a cage

**Duty Assignment**
- Undercover Units:
  - o Chief Chris Gore Plain Clothes
  - o Sergeant Shane Rigdon Plain Clothes
  - o Corporal Jon Moore Plain Clothes
  - o Investigator Felicia Webb Plain Clothes
  - o Investigator Jassmine Huff Plain Clothes
  - o Investigator Marissa Sanchez Plain Clothes
  - o Deputy Gerald Cates Plain Clothes
  - o Deputy Daniel Telles Plain Clothes
- Interior Surveillance:
  - o Lieutenant Dale Hubert Plain Clothes
  - o Sergeant Andy Reyna Plain Clothes
  - o Aaron Harsha Plain Clothes
  - o Deputy Plain Clothes
- Exterior Surveillance:
  - o Sergeant Brad Geaslin plain clothes unmarked vehicle
  - o Deputy Frank Mena plain clothes unmarked vehicle
- Arrest/Evidence Team/Scene Photos:
  - o Deputy Gerald Cates plain clothes with vest
  - o Deputy Daniel Telles plain clothes with vest
  - o Deputy Scott Barnett plain clothes with vest
- Processing/Initial Interviews/Suspect Photos:
  - o Lieutenant Scales plain clothes with vest
  - o Deputy Aaron Munoz plain clothes with vest
  - o Deputy Jose Gonzalez plain clothes with vest
- Marked Uniformed Patrol Units:
  - o Sergeant Carlos McClerkin
  - o Deputy Rudy Guillen
  - o Deputy Rafael Hubert
- Ad/website communication
  - o Corporal Jon Moore
  - o Investigator Felicia Webb
  - o Investigator Jassmine Huff
- Transport/Booking Team
  - o Deputy Mark Salinas - unmarked vehicle with a cage
  - o Deputy Chris Koutsogannis - unmarked vehicle with a cage
  - o Deputy Casey Dobbins - unmarked vehicle with a cage

**Target Location:**



Plaintiff 001373

1

2

3

4

5

6

7

8

9

10                    TRANSCRIPT OF AUDIO FILE

11                        VIDEO JAN 27

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Plaintiff 003224

2

```
 1          MARISSA SANCHEZ:  Hi.
 2          ERICA DAVIS:  Hi.  How are you?
 3          MARISSA SANCHEZ:  Good.  How are you?
 4          ERICA DAVIS:  Can you close the door?
 5   (Indiscernible)
 6          MARISSA SANCHEZ:  All right.
 7          ERICA DAVIS:  I don't think we've
 8   actually talked before.
 9          MARISSA SANCHEZ:  Yeah.
10          ERICA DAVIS:  Okay.  Let's do it.
11   (Indiscernible)
12          MARISSA SANCHEZ:  Uh-huh (affirmative).
13          ERICA DAVIS:  (Indiscernible)
14          MARISSA SANCHEZ:  Right.
15          ERICA DAVIS:  And (indiscernible).  I
16   mean, you're in my community.
17          MARISSA SANCHEZ:  Uh-huh (affirmative).
18          ERICA DAVIS:  You're in my community.
19          (Indiscernible)
20          RIGDON:  No, no.  Oh, here.
21          ERICA DAVIS:  No, no.  Right here.  Right
22   here.
23          In my community, everybody here.
24          MARISSA SANCHEZ:  Uh-huh (affirmative).
25          ERICA DAVIS:  So if someone's child is
```

Plaintiff 003225

```
 1   not feeling good --

 2           MARISSA SANCHEZ:  Uh-huh (affirmative).

 3           ERICA DAVIS:  -- I'll try to go out of my

 4   way to see how we can find resources --

 5           MARISSA SANCHEZ:  Right.

 6           ERICA DAVIS:  -- aside from what's going

 7   on.

 8           MARISSA SANCHEZ:  Uh-huh (affirmative).

 9           ERICA DAVIS:  Okay.

10           MARISSA SANCHEZ:  Uh-huh (affirmative).

11           ERICA DAVIS:  And so we can go back and

12   forth (indiscernible) issues (indiscernible)

13   individuals.

14           MARISSA SANCHEZ:  Right.

15           ERICA DAVIS:  They should be upfront.

16   And also the outcomes.  I'm like -- I speak up for

17   voices that can't be heard, okay.

18           MARISSA SANCHEZ:  Right.

19           ERICA DAVIS:  (Indiscernible) How you

20   feeling today?

21           MARISSA SANCHEZ:  Feel stressed out.

22           ERICA DAVIS:  (Indiscernible)

23           MARISSA SANCHEZ:  Yeah.  Not because of

24   the job.  I mean, the job (indiscernible) is a

25   stressful job.  But not only that, it's the drama
```

1   with that.

2          ERICA DAVIS:  Okay.  So drama of the

3   (indiscernible).

4          MARISSA SANCHEZ:  Just --

5          ERICA DAVIS:  Drama with (indiscernible).

6          MARISSA SANCHEZ:  It's just like drama on

7   the floor hearing it, I guess.  Like there's

8   always drama, I guess.

9          ERICA DAVIS:  Okay.

10          MARISSA SANCHEZ:  I'm not in that drama

11   but just hearing this and that, just tiring I

12   guess.  And then, I guess, my boss.

13          ERICA DAVIS:  Okay.  And who is your

14   boss?  Who is your boss?

15          MARISSA SANCHEZ:  Chief Gore.

16          ERICA DAVIS:  Okay.

17          MARISSA SANCHEZ:  I have an issue with

18   him, and it's hard to work when I have a problem

19   with my own boss.

20          ERICA DAVIS:  Okay.  Yeah, I understand.

21          MARISSA SANCHEZ:  Uh-huh (affirmative).

22          ERICA DAVIS:  (Indiscernible) And we're

23   supposed to be protectors.

24          MARISSA SANCHEZ:  Right.

25          ERICA DAVIS:  Right?

Plaintiff 003227

1           MARISSA SANCHEZ:  Uh-huh (affirmative).

2           ERICA DAVIS:  And so as a member of the

3    community, I want you to feel protected.

4           MARISSA SANCHEZ:  Uh-huh (affirmative).

5           ERICA DAVIS:  Okay.  And I want you to

6    know that whatever is said (indiscernible) I'm off

7    the clock.

8           MARISSA SANCHEZ:  Right.

9           ERICA DAVIS:  And I'm (indiscernible).

10          MARISSA SANCHEZ:  Uh-huh (affirmative).

11          ERICA DAVIS:  And so when you say

12   "uncomfortable," (indiscernible) telling me that

13   --

14          MARISSA SANCHEZ:  Yeah.  He's making it

15   hard for me to do my job.  We're partners kind of

16   like when we do our operations.

17          ERICA DAVIS:  Okay.

18          MARISSA SANCHEZ:  So he's my partner.  So

19   I guess he's taken that a little too far as far as

20   the bonding relationship type.

21          ERICA DAVIS:  Okay.

22          MARISSA SANCHEZ:  And it just seems like

23   either he like likes me that way, you know.  So

24   when we do our operation, you know, we got to do

25   operations, stuff like that.  Well, I can't do

Plaintiff 003228

```
 1    that when I'm -- he's always -- like I have to be
 2    with him.  Because if I leave him, he gets upset.
 3              ERICA DAVIS:  Okay.
 4              MARISSA SANCHEZ:  He makes it known it
 5    bothers him, so I can't fully do my job and learn
 6    because I've been in this division for six to
 7    seven months.  And there's a lot of stuff I don't
 8    know because he's keeping me from doing my job.
 9              ERICA DAVIS:  Okay.  And outside --
10              MARISSA SANCHEZ:  Uh-huh (affirmative).
11              ERICA DAVIS:  Let's go outside
12    (indiscernible).
13              MARISSA SANCHEZ:  Uh-huh (affirmative).
14              ERICA DAVIS:  You all have friendship
15    outside --
16              MARISSA SANCHEZ:  Who
17              ERICA DAVIS:  -- that you all have
18    established?
19              MARISSA SANCHEZ:  Yeah.
20              ERICA DAVIS:  Okay.  Just -- just asking.
21              MARISSA SANCHEZ:  Uh-huh (affirmative).
22              ERICA DAVIS:  Who do I have a friendship
23    here with that I go -- there is somebody. Captain
24    Williams (phonetic) --
25              MARISSA SANCHEZ:  Uh-huh (affirmative).
```

Plaintiff 003229

```
 1              ERICA DAVIS:  -- is a friend.

 2              MARISSA SANCHEZ:  Yeah.

 3              ERICA DAVIS:  We don't go places or

 4     anything, but he's a friend of mine.

 5              MARISSA SANCHEZ:  Right, right.

 6              ERICA DAVIS:  So I'll invite him to some

 7     of my friends' parties.

 8              MARISSA SANCHEZ:  Uh-huh (affirmative).

 9              ERICA DAVIS:  That's the only thing.  Is

10     it casual friendship, or you feel like it's

11     (indiscernible) that they thought it was more than

12     what you think (indiscernible)?

13              MARISSA SANCHEZ:  Well, it's more -- I

14     feel like it's more than what -- I don't know if

15     he wants more, or he thinks it's more.

16              ERICA DAVIS:  Has it ever been --

17              MARISSA SANCHEZ:  More?  No.

18              ERICA DAVIS:  Okay.  Does he know --

19              MARISSA SANCHEZ:  But the way he talks,

20     it's like, damn, you're acting like you're my

21     boyfriend or something.

22              ERICA DAVIS:  Okay.

23              MARISSA SANCHEZ:  Or you get jealous or

24     whatever it may be.

25              ERICA DAVIS:  Okay.
```

Plaintiff 003230

1          MARISSA SANCHEZ:  And just says that,

2     "Oh, I really care about you."  And -- I mean, I

3     know he care about everybody on the team, but --

4          ERICA DAVIS:  Right.

5          MARISSA SANCHEZ:  -- just feels a little

6     bit more than what it is.

7          ERICA DAVIS:  Okay.

8          MARISSA SANCHEZ:  And for a while, I

9     mean, I dealt with it, but then it's gotten worse,

10    and worse, and worse.  I'm like, oh, man, this is

11    not good.

12         ERICA DAVIS:  So I don't want -- first,

13    in the work that you're doing, everyone's voice

14    matters.

15         MARISSA SANCHEZ:  Uh-huh (affirmative).

16         ERICA DAVIS:  And I don't know -- you

17    know, one of the (indiscernible).

18         MARISSA SANCHEZ:  Uh-huh (affirmative).

19         ERICA DAVIS:  So I understand --

20         MARISSA SANCHEZ:  Yeah.

21         ERICA DAVIS:  -- from a perspective of

22    kind of like shock or not knowing what to do --

23         MARISSA SANCHEZ:  Uh-huh (affirmative).

24         ERICA DAVIS:  -- how do you go

25    (indiscernible).

Plaintiff 003231

```
 1                MARISSA SANCHEZ:  Yeah.

 2                ERICA DAVIS:  What I want you to do is to

 3   say that -- I don't want you to leave.

 4                MARISSA SANCHEZ:  Uh-huh (affirmative).

 5                ERICA DAVIS:  We want you here in our

 6   agency.

 7                MARISSA SANCHEZ:  Right.

 8                ERICA DAVIS:  If we can work on

 9   (indiscernible) --

10                MARISSA SANCHEZ:  Uh-huh (affirmative).

11                ERICA DAVIS:  -- would you feel

12   comfortable?

13                MARISSA SANCHEZ:  I mean, yeah, it just

14   sucks because I like what I do.  And for me to

15   have to leave the division because of my own boss.

16                ERICA DAVIS:  No.  And I promise it will

17   be more changes.

18                MARISSA SANCHEZ:  Uh-huh (affirmative).

19                ERICA DAVIS:  And I can't -- when I say I

20   promise that is -- I can't move mountains.

21                MARISSA SANCHEZ:  Yeah.

22                ERICA DAVIS:  Mountains can't be moved in

23   (indiscernible).

24                MARISSA SANCHEZ:  Right.

25                ERICA DAVIS:  Right?
```

Plaintiff 003232

1             MARISSA SANCHEZ:  Uh-huh (affirmative).

2             ERICA DAVIS:  But I know by losing you, I

3    could lose you tomorrow.

4             MARISSA SANCHEZ:  Uh-huh (affirmative).

5             ERICA DAVIS:  And I don't want to do

6    that.

7             MARISSA SANCHEZ:  Right.

8             ERICA DAVIS:  And if you can -- if we can

9    -- let's figure it out.  Like let's give you a

10   breather.

11            MARISSA SANCHEZ:  Uh-huh (affirmative).

12            ERICA DAVIS:  Room to breathe.  You never

13   know.  It might -- I don't know if you've met my

14   dad upstairs, chaplain.

15            RIGDON:  (Indiscernible)

16            ERICA DAVIS:  You know, you might feel

17   refreshed for a month or so.

18            MARISSA SANCHEZ:  Uh-huh (affirmative).

19            ERICA DAVIS:  And something else changes

20   where you can go back doing what you love doing.

21            MARISSA SANCHEZ:  Right.

22            ERICA DAVIS:  And learning.

23            MARISSA SANCHEZ:  Uh-huh (affirmative).

24            ERICA DAVIS:  But totally shifting -- and

25   I don't want to (indiscernible), and I don't want

1   to lose you.

2           MARISSA SANCHEZ:  Yeah.

3           ERICA DAVIS:  Because you're -- I hope

4   you feel like outside of that narrow aspect of

5   what's been transpiring --

6           MARISSA SANCHEZ:  Uh-huh (affirmative).

7           ERICA DAVIS:  -- that you feel this is

8   home.

9           MARISSA SANCHEZ:  Yeah.

10          ERICA DAVIS:  And that's what I want you

11  to feel.

12          MARISSA SANCHEZ:  Yeah.  I mean, I love

13  working here.  I was on patrol, and I loved it.  I

14  didn't have no drama, did my own thing.

15          ERICA DAVIS:  (Indiscernible)

16          MARISSA SANCHEZ:  Yeah.  And then I came

17  here.  I liked it.  You know, I liked it.  There's

18  (indiscernible).  I started -- but now I hate

19  coming to work, and I shouldn't be like that.  And

20  I'm to a point where I'm looking at other places

21  to go, and I don't want to do that.  But I also

22  don't want to go back to patrol and be on -- start

23  from the bottom where I started, which was

24  nightshift, and I hated that.

25          ERICA DAVIS:  I know.

Plaintiff 003234

1          MARISSA SANCHEZ:  You know what I mean?

2          ERICA DAVIS:  I know.

3          MARISSA SANCHEZ:  And it just --

4          ERICA DAVIS:  And this -- let me -- can I

5   (indiscernible) --

6          MARISSA SANCHEZ:  Uh-huh (affirmative).

7          ERICA DAVIS:  (Indiscernible)

8          MARISSA SANCHEZ:  Uh-huh (affirmative).

9          ERICA DAVIS:  How does a transfer on

10  paper even work?

11          RIGDON:  She just fills out a transfer,

12  but --

13          MARISSA SANCHEZ:  It goes through him.

14          ERICA DAVIS:  So (indiscernible).

15          MARISSA SANCHEZ:  Uh-huh (affirmative).

16          ERICA DAVIS:  And I say that because if I

17  didn't feel comfortable, which I didn't

18  (indiscernible) something happen, I had to go

19  somewhere else.

20          MARISSA SANCHEZ:  Uh-huh (affirmative).

21          ERICA DAVIS:  And I want to be that place

22  where you can go.

23          MARISSA SANCHEZ:  Uh-huh (affirmative).

24          ERICA DAVIS:  But I don't want you to

25  leave.

Plaintiff 003235

```
 1              MARISSA SANCHEZ:  Right.

 2              ERICA DAVIS:  So that means I will eat up

 3    whatever --

 4              MARISSA SANCHEZ:  Uh-huh (affirmative).

 5              ERICA DAVIS:  -- comes my way to get that

 6    (indiscernible) and see where it lands.  Because

 7    I've already heard you don't want to go

 8    (indiscernible).  You don't want to go to

 9    nightshift.  These are (indiscernible).

10              MARISSA SANCHEZ:  Uh-huh (affirmative).

11              ERICA DAVIS:  I don't want to go to

12    nightshift, but I have to (indiscernible).

13              MARISSA SANCHEZ:  Yeah.

14              ERICA DAVIS:  You know what I mean?

15              MARISSA SANCHEZ:  Uh-huh (affirmative).

16              ERICA DAVIS:  Let me find something.

17              MARISSA SANCHEZ:  Yeah.  Because I was

18    good where I was at, and then he came to me and

19    started like bugging me to come to human

20    trafficking.  I don't know.  I just felt like I

21    was obligated to -- because he kept like, "Come

22    on, come on, come on, like you should."  And I was

23    like, okay, I will.

24              ERICA DAVIS:  And where you were, it was

25    (indiscernible), right?
```

1          MARISSA SANCHEZ:  It was Campus Park.  It

2     was just a small (indiscernible) that's in

3     Braeswood.

4          ERICA DAVIS:  Okay.

5          MARISSA SANCHEZ:  Yeah.  I was even

6     shift.  It was -- I mean, I had a set schedule.  I

7     stayed to myself.  I did my own thing.

8          ERICA DAVIS:  Did you like it?

9          MARISSA SANCHEZ:  Uh-huh (affirmative).

10         ERICA DAVIS:  Okay.

11         MARISSA SANCHEZ:  It was fine.

12         ERICA DAVIS:  So can you do me that by

13    halting going outside.

14         MARISSA SANCHEZ:  Uh-huh (affirmative).

15         ERICA DAVIS:  And let me work on --

16         MARISSA SANCHEZ:  Yeah.

17         ERICA DAVIS:  (Indiscernible)

18         MARISSA SANCHEZ:  Because I don't want to

19    leave this agency.  I really don't.

20         ERICA DAVIS:  Okay.

21         MARISSA SANCHEZ:  But I did start looking

22    at other agencies.  I'm like, man, I don't want to

23    start all over again.  And it's just -- I just

24    feel like it's just going to get worse.

25         ERICA DAVIS:  Okay.

1           MARISSA SANCHEZ:  Honestly, I mean, he's

2    just being petty.  Like he's helped me with my

3    truck, my personal truck.

4           ERICA DAVIS:  Okay.

5           MARISSA SANCHEZ:  I had problems with my

6    trucks a couple months back.  He's helped me with

7    it, got it fixed.  I asked him, "How much do I owe

8    you?"  I paid him like 200 every -- every time we

9    got paid.

10          ERICA DAVIS:  Uh-huh (affirmative).

11          MARISSA SANCHEZ:  I knew it was more than

12   what I gave him.

13          ERICA DAVIS:  Okay.

14          MARISSA SANCHEZ:  And he's like, "No.

15   You don't have to pay me more.  We're good.  Stop

16   paying me."  That was months ago.  I get a text

17   message today, "Hey, what's the plan?  When do you

18   plan on paying me for the truck?"  What?  You told

19   me -- like, okay.  Is that how you want to play?

20   So I just hurried up and sent him the money.  Like

21   I was going to -- I had the messages that showed

22   like, "You don't have to pay me.  We're good."

23   Because I said, "I don't have cash, but tell me

24   how much.  I can Venmo you whatever."  And he

25   said, "Don't worry about it."

1          So I didn't worry about, like because you

2     can't -- he doesn't take no.  Or he doesn't -- you

3     know, it's just the type of person he is.  So when

4     he sent me that message, I'm like, really.  You're

5     going to play that game with me, like out of

6     nowhere.

7          ERICA DAVIS:  Okay.

8          MARISSA SANCHEZ:  So I just sent him the

9     money.

10         ERICA DAVIS:  And do you have any

11    balance, just to make sure?

12         MARISSA SANCHEZ:  Yeah.  I sent him the

13    money and a screenshot to him showing that I sent

14    it to him.

15         ERICA DAVIS:  You completed it?

16         MARISSA SANCHEZ:  Yeah.  He sent me how

17    much I owe him.

18         ERICA DAVIS:  Okay.

19         MARISSA SANCHEZ:  So I sent it to him,

20    and then I screenshot it.  Then I sent it to him

21    again, and he said, "Got it.  Thanks."

22         ERICA DAVIS:  Okay.

23         MARISSA SANCHEZ:  But it just blew my

24    mind, like really?  You told me -- why are you

25    doing this?  So I just feel like it's --

```
 1   everything is just going to get worse.  Like
 2   there's a lot of different incidents that has
 3   happened, but he'll blame it on someone else --
 4           ERICA DAVIS:  Okay.
 5           MARISSA SANCHEZ:  -- you know.
 6           ERICA DAVIS:  Okay.  And that's he
 7   say/she say, right?
 8           MARISSA SANCHEZ:  I mean --
 9           ERICA DAVIS:  You know first --
10           MARISSA SANCHEZ:  No, no.  I know for a
11   fact like he's lying.
12           ERICA DAVIS:  Okay.
13           MARISSA SANCHEZ:  I've had a meeting with
14   him.
15           ERICA DAVIS:  Uh-huh (affirmative).
16           MARISSA SANCHEZ:  And he lies right to my
17   face, and that's when I'm like, why would I want
18   to work under someone that just lies.  You're my
19   boss.  And one thing he always says to me, "One
20   thing about me is I don't lie."
21           ERICA DAVIS:  Right.
22           MARISSA SANCHEZ:  Like, okay, but yet
23   you're lying to me, you know.  Like with my truck
24   incident, he helped me get my truck, and then I
25   had to take it to (indiscernible).  He asked me,
```

1    "Hey, how you going to take your truck home?"

2         I said, I don't know.  I'll figure it

3    out.  I didn't want him to take me because it's

4    going to be awkward in the car ride, and I didn't

5    want to be in that situation.  So I got another

6    coworker to take me, you know, took off, bought

7    the car, whatever, took it.

8         Came back.  He tows -- my coworker gets

9    towed.  Oh, by the way, he can't be in the office

10   anyway.  You can't come in our office anymore.

11   What?  Why?  I felt like that was like -- he was

12   retaliating because she took me to go get my

13   truck.  I didn't let him.  I let her.

14        ERICA DAVIS:  Okay.

15        MARISSA SANCHEZ:  But then when I asked

16   him about it, he's all, "What are you talking

17   about?  I had no idea."  He blamed it on Rigdon.

18        ERICA DAVIS:  Okay.

19        MARISSA SANCHEZ:  A lot -- everything

20   that he does or tells me, he blames it on -- "What

21   are you talking about?"

22        ERICA DAVIS:  Yeah.

23        MARISSA SANCHEZ:  "That's Rigdon.  I have

24   no idea.  That's all Rigdon."  It's not true.

25        ERICA DAVIS:  So -- okay.

Plaintiff 003241

```
 1              MARISSA SANCHEZ:  This is a lot.  We went
 2    to San Antonio, and then -- that was a lot too.  I
 3    mean, we -- he wanted to bond.
 4              ERICA DAVIS:  Okay.  Was everybody
 5    bonding or --
 6              MARISSA SANCHEZ:  I mean, I guess, but no
 7    one wanted to go to that.  We had other training
 8    that everyone wanted to go to or whatever.  But it
 9    wasn't necessary for us to go to San Antonio and
10    stay the night there.  But he said it was for
11    bonding, for us to all bond, but we didn't do no
12    bonding.
13              ERICA DAVIS:  Okay.
14              MARISSA SANCHEZ:  So -- and then after --
15    and then that night he was like, "Fuck this
16    bonding shit."  Because he didn't get what he
17    wanted.  I was -- when we went out, I was texting
18    -- didn't talk to him, wasn't paying him no mind.
19              ERICA DAVIS:  Uh-huh (affirmative).
20              MARISSA SANCHEZ:  So he snapped me and
21    was like, "Wow, really?"
22              ERICA DAVIS:  Oh, like so you all ended
23    up -- like girls night out?  You all went out?
24    Kind of like --
25              MARISSA SANCHEZ:  Yeah.
```

1          ERICA DAVIS:  You were all --

2          RIGDON:  Everybody went to eat.

3          MARISSA SANCHEZ:  Yeah.  We went to eat.

4          ERICA DAVIS:  Okay.  When you -- when you

5     --

6          RIGDON:  Yeah.  We went to eat, and then

7     we went to another place (indiscernible).

8          ERICA DAVIS:  Without, you know --

9          RIGDON:  No, no.  He wanted to go, but it

10    was basically me, Sanchez, Moore ate.  He ended up

11    going home.  Webb got sick.  And then Huff was

12    there.  And then it was just -- first it started

13    at the restaurant.

14         MARISSA SANCHEZ:  Yeah.  We were just

15    eating, had a drink.

16         ERICA DAVIS:  Okay.

17         MARISSA SANCHEZ:  And then we went to

18    some other place at the River Walk, and we

19    actually -- everyone was tired.  We really didn't

20    want to be there.

21         ERICA DAVIS:  Okay.

22         MARISSA SANCHEZ:  So I just was on my

23    phone and so was --

24         ERICA DAVIS:  I'm listening to you.

25         MARISSA SANCHEZ:  Someone -- I guess --

Plaintiff 003243

 1  everyone was on their phone.  It just -- you could

 2  tell we were tired, waiting to go.

 3          ERICA DAVIS:  Okay.

 4          MARISSA SANCHEZ:  And I guess he got

 5  upset.

 6          ERICA DAVIS:  Okay.

 7          MARISSA SANCHEZ:  Because we weren't

 8  bonding, or I wasn't showing him attention.  And

 9  -- I mean, Rigdon saw it, like the way -- I mean,

10  you know how you can just see someone staring at

11  you?

12          ERICA DAVIS:  Uh-huh (affirmative).

13          MARISSA SANCHEZ:  He was just staring at

14  me.

15          RIGDON:  When we got in our hotel, we

16  wanted (indiscernible).  We can't do it because

17  they're -- he's got -- I don't want to say

18  possessive.

19          MARISSA SANCHEZ:  I would say that.

20          ERICA DAVIS:  Okay.  So --

21          RIGDON:  You were asking if Huff made a

22  comment when we got back.  This is what made me

23  start thinking about it.  What's the deal?  It's

24  not like we're trying to fuck.

25          ERICA DAVIS:  Uh-huh (affirmative).  Uh-

1    huh (affirmative).

2            RIGDON:  And then that's when she told

3    me, you know, "It feels like he wants to have a

4    relationship with (indiscernible)."

5            ERICA DAVIS:  Wait.  This was --

6            RIGDON:  Right after San Antonio.  Yeah.

7            ERICA DAVIS:  Okay.  But I heard -- did

8    she say it to you.

9            RIGDON:  No, no.  She was talking about

10   -- they're wanting me to stay and (indiscernible).

11           ERICA DAVIS:  Okay.  Got it.

12           RIGDON:  And my hands --

13           ERICA DAVIS:  Okay.  Is there any other

14   -- during this (indiscernible)?  Do you want to

15   have conversations by yourself with me?

16           MARISSA SANCHEZ:  No.  I mean, there's

17   nothing like -- he knows everything.

18           ERICA DAVIS:  Okay.

19           MARISSA SANCHEZ:  I've done told him

20   everything.

21           ERICA DAVIS:  Are you sure?

22           MARISSA SANCHEZ:  No.  And everyone sees

23   it.  Like, you know, Jaqueline sees it.  Lakeen

24   (phonetic) sees it, and he just stops me from

25   doing my job like -- that's what I feel like.  And

Plaintiff 003245

```
 1    I just feel like overwhelmed, and I feel like I'm
 2    trying to keep my relationship with him because
 3    he's my boss.  And --
 4           ERICA DAVIS:  Right.
 5           MARISSA SANCHEZ:  -- it's just --
 6           ERICA DAVIS:  It's a just different type
 7    of --
 8           MARISSA SANCHEZ:  Yeah.  Like he's like,
 9    "I would never do this for anybody.  I take care
10    of you," blah, blah, blah.  I'm like -- it's just
11    weird.
12           ERICA DAVIS:  yeah.
13           MARISSA SANCHEZ:  And he gets made if I
14    don't like open up.  He said, "You need to open
15    up."  Like that's not me, and I wouldn't -- why
16    would I open up to you.
17           ERICA DAVIS:  (Indiscernible)
18           MARISSA SANCHEZ:  Yeah.  And he got mad
19    because I said with operations, I keep it strictly
20    business.  I don't see -- like I told someone,
21    it's strictly business to me.  Like I don't see it
22    as a relationship.  I don't -- you know, it is
23    what it is.  He's like, "Wow, that's hurtful."
24    What do you mean?  Like that's what it is.  It's
25    just my job.  Do what we got to do, move on.  But
```

Plaintiff 003246

1    he --

2           ERICA DAVIS:   (Indiscernible)

3           MARISSA SANCHEZ:   Uh-huh (affirmative).

4           ERICA DAVIS:   (Indiscernible) First,

5    thank you for not (indiscernible).   Like coming to

6    me because it could be worse, you know what I

7    mean.

8           MARISSA SANCHEZ:   Right.

9           ERICA DAVIS:   You're protecting the mean

10   and women here by coming to talk to me.   I need

11   you to make sure your voice is heard.

12          MARISSA SANCHEZ:   Yeah.

13          ERICA DAVIS:   And I don't want -- no one

14   should ever be in an uncomfortable work

15   environment.

16          MARISSA SANCHEZ:   Yeah.   It's just

17   stressing me out, and then like this weekend, like

18   I just feel like it's getting worse and worse.

19   And like this weekend -- like I break out in hives

20   when I stress out.

21          ERICA DAVIS:   Okay.

22          MARISSA SANCHEZ:   And I have an epi pen

23   and all that.   I broke out in hives Saturday, but

24   it was mild.   So I maintained it.   And then I have

25   -- the last time I broke out in hives when I was

Plaintiff 003247

```
 1   in college because of finals, but those -- I mean,

 2   I had severe hives.  And I broke out like, man,

 3   what the heck.  And you know, I got knots, and

 4   it's all because of work.  And I dread coming to

 5   work every day.  I'm like what's going to happen

 6   today or -- you know.  And they've asked me if I

 7   want to transfer.

 8           ERICA DAVIS:  Who has asked?

 9           MARISSA SANCHEZ:  No.  Like Rigdon has

10   asked me like -- he's like, "I get what you're

11   going through, you know."  But -- I don't want to

12   transfer, but then sometimes I do.  I'm confused

13   because I want to do this job.

14           ERICA DAVIS:  You want (indiscernible).

15           MARISSA SANCHEZ:  But I can't work under

16   --

17           ERICA DAVIS:  So if you can, you can

18   write me like a letter.

19           MARISSA SANCHEZ:  Uh-huh (affirmative).

20           ERICA DAVIS:  Act like I'm your friend.

21           MARISSA SANCHEZ:  Uh-huh (affirmative).

22           ERICA DAVIS:  And tell me -- just write

23   -- I promise you, he will not see it.

24           MARISSA SANCHEZ:  Uh-huh (affirmative).

25           ERICA DAVIS:  Promise you, okay.
```

Plaintiff 003248

26

1              MARISSA SANCHEZ:  Uh-huh (affirmative).

2              ERICA DAVIS:  And write it for me, do the

3    transfer paper, and bring it to me.

4              MARISSA SANCHEZ:  Uh-huh (affirmative).

5              ERICA DAVIS:  So I can figure out how to

6    maneuver.  I know you don't want to leave the

7    (indiscernible).

8              MARISSA SANCHEZ:  Right.

9              ERICA DAVIS:  But right away, like if an

10   incident on the street happened, we have a

11   discussion.  We automatically move the officer to

12   a desk job or off of patrol.

13             MARISSA SANCHEZ:  Right.

14             ERICA DAVIS:  Maybe that's negative in a

15   sense --

16             MARISSA SANCHEZ:  Uh-huh (affirmative).

17             ERICA DAVIS:  -- but it's for the public

18   perception as well as like until this is like --

19   you know, the investigation is complete, we're

20   going to move this officer, right.

21             MARISSA SANCHEZ:  Right.

22             ERICA DAVIS:  I want to make this a

23   healthy move, just for a little bit.

24             MARISSA SANCHEZ:  Right.

25             ERICA DAVIS:  And just the paperwork.

Plaintiff 003249

1              MARISSA SANCHEZ:  Uh-huh (affirmative).

2              ERICA DAVIS:  So in your mind as you come

3    to work, if you have comp time, you can use comp

4    time.

5              RIGDON:  Yeah.

6              ERICA DAVIS:  I will -- today is Monday.

7    (Indiscernible)

8              MARISSA SANCHEZ:  Uh-huh (affirmative).

9              ERICA DAVIS:  Try like to get your --

10   unless you feel like you're okay because you're

11   giving it to me, and you're able to be strong --

12             MARISSA SANCHEZ:  Uh-huh (affirmative).

13             ERICA DAVIS:  -- going upstairs.  And

14   they're like, okay, whatever.

15             MARISSA SANCHEZ:  I mean, I just stay in

16   the office.  Like I try not to even -- it's sad to

17   say, but I don't even like go into the restroom

18   because I'm like, man, I hope I don't run into him

19   or whatever.  And it shouldn't be like that, but

20   that's how it is.  Like I would just sit there and

21   like --

22             ERICA DAVIS:  But if you feel -- if you

23   feel better --

24             MARISSA SANCHEZ:  Uh-huh (affirmative).

25             ERICA DAVIS:  -- (indiscernible) and you

```
 1   feel okay --
 2             MARISSA SANCHEZ:  Uh-huh (affirmative).
 3             ERICA DAVIS:  -- because knowing that I
 4   have this --
 5             MARISSA SANCHEZ:  Yeah.
 6             ERICA DAVIS:  -- I want you to stay.
 7             MARISSA SANCHEZ:  Uh-huh (affirmative).
 8             ERICA DAVIS:  But if you're just saying
 9   these (indiscernible) are bothering me, you know,
10   something else is going to bother you, then I
11   suggest that you stay out (indiscernible).
12             MARISSA SANCHEZ:  Uh-huh (affirmative).
13             ERICA DAVIS:  But I do want you to do
14   (indiscernible) quickly.
15             MARISSA SANCHEZ:  Uh-huh (affirmative).
16             ERICA DAVIS:  And a transfer is not like
17   a bad thing.
18             MARISSA SANCHEZ:  Yeah.
19             ERICA DAVIS:  I just need something that
20   I can show, okay.
21             MARISSA SANCHEZ:  Uh-huh (affirmative).
22             ERICA DAVIS:  Does that make sense?
23             RIGDON:  Yeah.  I just don't -- again, I
24   want to speak up for her.  I mean, it's -- you
25   know, (indiscernible).
```

Plaintiff 003251

```
 1              ERICA DAVIS:  Uh-huh (affirmative).
 2              RIGDON:  I don't want her to be
 3    (indiscernible).  And like I said, I'm worried
 4    about the transfer frontline policy has got to go
 5    through Gore to get the transfer.  Is he going to
 6    say anything about it when he gets it later
 7    (indiscernible)?  And you know, she's expressed
 8    long-term retaliatory (indiscernible) --
 9              ERICA DAVIS:  (Indiscernible) I wrote the
10    policies.  (Indiscernible) It's not going to come
11    to him from another way.  I need it for something
12    else.
13              RIGDON:  I mean, like just --
14              ERICA DAVIS:  Right.
15              RIGDON:  Because -- I mean, that's one
16    thing she's expressed is he is --
17              ERICA DAVIS:  (Indiscernible) But who is
18    your direct sergeant?
19              RIGDON:  Because Moore is leaving.
20              ERICA DAVIS:  Okay.  So wait, Moore is at
21    the moment?
22              RIGDON:  Uh-huh (affirmative).
23              ERICA DAVIS:  Your direct?  Okay.
24              MARISSA SANCHEZ:  His last day is what,
25    Thursday?
```

```
 1          RIGDON:  Yeah.

 2          ERICA DAVIS:  Okay.  And then it's your

 3  lieutenant, right?

 4          RIGDON:  Uh-huh (affirmative).

 5          ERICA DAVIS:  Okay.  Does that go down

 6  the line?  (Indiscernible) are we afraid if we

 7  give it to Moore, there's going (indiscernible)?

 8          MARISSA SANCHEZ:  Huh-uh (negative).

 9          ERICA DAVIS:  Okay.  So do it the right

10  way then.  That's the one copy.

11          MARISSA SANCHEZ:  Okay.

12          ERICA DAVIS:  Give it to Moore.  Let

13  Moore give it to me, and then we will wait and see

14  what we do.  And when you take (indiscernible).

15          MARISSA SANCHEZ:  Yeah.

16          ERICA DAVIS:  And tell me how quickly

17  they (indiscernible).

18          RIGDON:  They just say -- Moore just hand

19  it to me.

20          ERICA DAVIS:  Hand it to you?

21          RIGDON:  They just --

22          ERICA DAVIS:  Protocol, okay.  Good.

23  Good.

24          MARISSA SANCHEZ:  It's just that I feel

25  like --
```

1          ERICA DAVIS:  (Indiscernible) It's known

2   now.  Does that make sense?

3          RIGDON:  Oh, I know.

4          ERICA DAVIS:  It's known.

5          MARISSA SANCHEZ:  But there's like --

6   people are leaving or wanting to leave

7   (Indiscernible) because of --

8          RIGDON:  (Indiscernible)

9          ERICA DAVIS:  Getting you (indiscernible)

10  a transfer helps with that?

11         MARISSA SANCHEZ:  No, no.  It does.

12  Because there's -- I mean, people are retiring,

13  you know.

14         ERICA DAVIS:  Right.  And I think someone

15  made a comment in front of you (indiscernible),

16  number one.

17         RIGDON:  Yeah.

18         ERICA DAVIS:  And that was a message.

19         RIGDON:  It was.  But if you don't have

20  my back, there's someone else there.

21         ERICA DAVIS:  (Indiscernible)

22         RIGDON:  I don't want to say anything in

23  front of anyone else.

24         ERICA DAVIS:  Okay.  Okay.

25         RIGDON:  Yeah.

```
1              ERICA DAVIS:  Okay.

2              RIGDON:  That was Thursday.

3              ERICA DAVIS:  Okay.

4              RIGDON:  And then Friday was -- of

5    course, it was (indiscernible).  So it was kind of

6    mine.  That's when I said, you know what, I'm just

7    going to have to --

8              ERICA DAVIS:  Yeah.

9              RIGDON:  -- do it this route.

10             ERICA DAVIS:  Yeah, yeah.  Yeah.

11             RIGDON:  For me --

12             ERICA DAVIS:  How do you feel?  What do

13   you --

14             MARISSA SANCHEZ:  I feel overwhelmed.  I

15   can't even focus on my job right now because I

16   have this going on.  Like my mind is elsewhere.

17   It should be focusing on what I got to do for

18   work, but I can't even -- I can't focus.  Like I

19   just -- I'm here, but I'm not here, if that makes

20   any sense.

21             ERICA DAVIS:  (Indiscernible)

22             MARISSA SANCHEZ:  Uh-huh (affirmative).

23             ERICA DAVIS:  (Indiscernible)

24             MARISSA SANCHEZ:  But I never -- I've

25   never been in anything like this, never been
```

```
 1    stressed out at my job.  Yes.  This job is

 2    stressful, but I've never been like, oh, my God

 3    like -- I've never been like that.  And I don't

 4    give -- I'm not a person that gives up, and part

 5    of me feels like I'm giving up.  Like let me just

 6    go back to patrol like -- or whatever.  Let me

 7    just go to a different division.

 8          Part of me is like, damn, just giving up

 9    like that, and I'm trying to hang on.  That's why

10    I just say I'm confused.

11          ERICA DAVIS:  Okay.  So I do have to ask

12    you -- and I am listening to you.  As your

13    coworker, do you --

14          MARISSA SANCHEZ:  Uh-huh (affirmative).

15          ERICA DAVIS:  I have to ask this.  Do you

16    want to make a complaint?

17          MARISSA SANCHEZ:  I don't know.

18          ERICA DAVIS:  Because I have to make sure

19    that I'm not swaying you.

20          MARISSA SANCHEZ:  Yeah, yeah, yeah.  No.

21    At this time, no.

22          ERICA DAVIS:  Okay.

23          MARISSA SANCHEZ:  I just --

24          ERICA DAVIS:  I just want you to know

25    that your letter (indiscernible).  It's just me
```

1    and you.

2              MARISSA SANCHEZ:  Yeah.  No.

3              ERICA DAVIS:  Because (indiscernible).

4              MARISSA SANCHEZ:  Uh-huh (affirmative).

5              ERICA DAVIS:  Let me handle it.

6              MARISSA SANCHEZ:  I just -- I know

7    they're close to --

8              ERICA DAVIS:  Who?

9              MARISSA SANCHEZ:  The boss and --

10             ERICA DAVIS:  Let me --

11             MARISSA SANCHEZ:  I mean, that's what he

12   makes it seem like at least.

13             ERICA DAVIS:  Correct.  And he would be

14   having this conversation with him and not me.

15             MARISSA SANCHEZ:  Right.

16             ERICA DAVIS:  Does that make sense?

17             MARISSA SANCHEZ:  Uh-huh (affirmative).

18             ERICA DAVIS:  If I'm -- if I'm that -- if

19   somebody is that close --

20             MARISSA SANCHEZ:  Uh-huh (affirmative).

21             ERICA DAVIS:  -- they don't -- they

22   wouldn't be in a position to pull people out of

23   rank and --

24             MARISSA SANCHEZ:  Yeah.

25             ERICA DAVIS:  -- (indiscernible).  Let's

```
 1    just be honest about it.
 2              MARISSA SANCHEZ:  Uh-huh (affirmative).
 3              ERICA DAVIS:  So I'm here because I serve
 4    as a -- as a protect.
 5              MARISSA SANCHEZ:  Right.
 6              ERICA DAVIS:  And protecting, I have to
 7    find out what's going on.
 8              MARISSA SANCHEZ:  Yeah.
 9              ERICA DAVIS:  (Indiscernible)
10              MARISSA SANCHEZ:  Right, right.
11              ERICA DAVIS:  But he is who he is, who he
12    says he is.
13              MARISSA SANCHEZ:  Uh-huh (affirmative).
14              ERICA DAVIS:  And sometimes when the
15    structure of law enforcement, the realness never
16    gets to him.
17              MARISSA SANCHEZ:  Uh-huh (affirmative).
18              ERICA DAVIS:  The real ones are coming to
19    me.
20              MARISSA SANCHEZ:  Uh-huh (affirmative).
21              ERICA DAVIS:  And that's where people
22    don't like me.
23              MARISSA SANCHEZ:  Yeah.
24              ERICA DAVIS:  Because I'm going to have
25    that voice.
```

36

1              MARISSA SANCHEZ:  Uh-huh (affirmative).

2              ERICA DAVIS:  And so I'm glad that -- and

3    I would protect him too.

4              MARISSA SANCHEZ:  Yeah.

5              ERICA DAVIS:  Okay.  You know, you

6    stopped by to get some.  If that's what he says to

7    me when I start inquiring, you can put it all on

8    me --

9              MARISSA SANCHEZ:  Uh-huh (affirmative).

10             ERICA DAVIS:  -- you know, if it ever --

11             MARISSA SANCHEZ:  Yeah.

12             ERICA DAVIS:  -- f it makes you feel

13   better.  I just feel like I can talk

14   (indiscernible).

15             MARISSA SANCHEZ:  Uh-huh (affirmative).

16             ERICA DAVIS:  You work in the community.

17   I'm a member of the community too.

18             MARISSA SANCHEZ:  Uh-huh (affirmative).

19             ERICA DAVIS:  And that's -- that's the

20   angle I will pull.

21             MARISSA SANCHEZ:  Yeah.

22             ERICA DAVIS:  Okay.

23             MARISSA SANCHEZ:  Because I know -- go

24   where he watches these videos by the elevator, you

25   know, constant hallway.  I know that because --

Plaintiff 003259

```
 1    I'm tagging the phone Friday of me and Jonathan.
 2    Kids came up, whatever, talked to me for a little
 3    bit.  That was it.  Jonathan told me today, he
 4    said he was in Gore's office and Gore is like,
 5    "Hey, who is Sanchez talking to, that big white
 6    dude?  What are they talking about?"
 7            "Dang, you really watching that camera."
 8            RIGDON:  There's cameras all over the
 9    place.
10            MARISSA SANCHEZ:  Yeah.  Like why -- like
11    --
12            ERICA DAVIS:  I bet he's watching me too.
13            MARISSA SANCHEZ:  I don't think he has it
14    on.
15            RIGDON:  He can if he goes through CPS.
16    I think that they --
17            ERICA DAVIS:  But I mean, it's --
18            MARISSA SANCHEZ:  Why?
19            RIGDON:  He can't -- he doesn't watch
20    (indiscernible).
21            MARISSA SANCHEZ:  That's like -- I said
22    -- I found out today.  I was like, "Really?"  He
23    actually -- what were they talking about?  What
24    were they talking about?
25            ERICA DAVIS:  (Indiscernible)
```

1          MARISSA SANCHEZ:  Yeah.  I didn't tell

2     him that.

3          ERICA DAVIS:  Well, we also have the mess

4     makers, either in (indiscernible) create stuff,

5     you know.

6          MARISSA SANCHEZ:  Yeah.

7          ERICA DAVIS:  You know --

8          MARISSA SANCHEZ:  But Jonathan has no

9     idea about any of this.  So when he told me that,

10    I was like, "What?"  Then Jonathan said that Gore

11    was like -- this morning, like, "Oh, there's a

12    mess already.  They haven't even started."  And

13    he's like, "What are you talking about, mess?"

14    "Mess in the -- in our office."  He's like,

15    "That's why I'm not putting you in that office."

16         RIGDON:  And he (indiscernible).

17         ERICA DAVIS:  Huh?

18         RIGDON:  (Indiscernible) Webb.  He's

19    (indiscernible).

20         ERICA DAVIS:  Who?

21         RIGDON:  Webb, the last one.

22         ERICA DAVIS:  No.  I think -- I think

23    (indiscernible).  No.  No.  That's

24    (indiscernible).  The officers have this mindset

25    (indiscernible) structure.  I try to get my

Plaintiff 003261

```
 1    brother out of that mindset.  I mean, I have a

 2    (indiscernible).  I protect.  Listen -- but to get

 3    off (indiscernible), I have to -- I have to do, or

 4    I'm going to be this.  That's a horrible, horrible

 5    systematic approach.

 6            RIGDON:  Uh-huh (affirmative).

 7            ERICA DAVIS:  (Indiscernible) So that's

 8    why I'm here.

 9            MARISSA SANCHEZ:  Uh-huh (affirmative).

10            ERICA DAVIS:  (Indiscernible)

11            MARISSA SANCHEZ:  Uh-huh (affirmative).

12            ERICA DAVIS:  (Indiscernible) stop by.

13            MARISSA SANCHEZ:  Uh-huh (affirmative).

14            ERICA DAVIS:  Just come (indiscernible).

15            MARISSA SANCHEZ:  Uh-huh (affirmative).

16            ERICA DAVIS:  (Indiscernible) but do the

17    paperwork.

18            MARISSA SANCHEZ:  Definite.

19            ERICA DAVIS:  Do it, please.

20            MARISSA SANCHEZ:  Uh-huh (affirmative).

21            ERICA DAVIS:  Give it to me.  Give it to

22    Rigdon.  Rigdon, you text me when you have it.

23            RIGDON:  All right.

24            ERICA DAVIS:  And then I might even set

25    it up that way that I have somebody else in there.
```

Plaintiff 003262

1          MARISSA SANCHEZ:  Uh-huh (affirmative).

2          ERICA DAVIS:  Make sense?

3          MARISSA SANCHEZ:  Yeah.

4          ERICA DAVIS:  So that they will -- they

5    will act right.

6          MARISSA SANCHEZ:  Right.

7          ERICA DAVIS:  And you won't have to worry

8    about anything.

9          MARISSA SANCHEZ:  Uh-huh (affirmative).

10          ERICA DAVIS:  And then let me work on how

11    to (indiscernible).

12          MARISSA SANCHEZ:  Uh-huh (affirmative).

13          ERICA DAVIS:  Okay.  Can I promise you

14    all that?  And it takes time.

15          MARISSA SANCHEZ:  Yes.

16          ERICA DAVIS:  It just -- (indiscernible)

17    going to work out, and I have a meeting

18    (indiscernible), okay.  How do you feel?

19          RIGDON:  I don't her today don't --

20    whatever she did, I wasn't going to be upset with

21    her because it's hard -- it's hard.  I can't do

22    what I need to do.

23          ERICA DAVIS:  And the whole thing for me,

24    honestly, is that the division itself

25    (indiscernible).

```
 1              MARISSA SANCHEZ:  Uh-huh (affirmative).
 2              ERICA DAVIS:  Respect.  I empathize
 3    (indiscernible).  For me, I'm utterly beyond
 4    words.  That shouldn't be happening within that.
 5              MARISSA SANCHEZ:  No.
 6              ERICA DAVIS:  Okay.
 7              MARISSA SANCHEZ:  Out of all the things.
 8              ERICA DAVIS:  Out of all --
 9              MARISSA SANCHEZ:  Yeah.
10              RIGDON:  Yeah.  Now you get Huff's.
11    Huff's situation is going to be completely
12    different.
13              ERICA DAVIS:  What is Huff's situation?
14              RIGDON:  She put a transfer in.
15              ERICA DAVIS:  Right.
16              RIGDON:  But hers is difficult.
17              ERICA DAVIS:  Well, I know.  She's mad at
18    you.
19              RIGDON:  Because I'm --
20              ERICA DAVIS:  (Indiscernible) or
21    something, right?
22              RIGDON:  She doesn't understand like when
23    we deal with people, you got to -- like we're
24    dealing with the directors over at JJC.
25              ERICA DAVIS:  Okay.
```

Plaintiff 003264

1          RIGDON:  People just come, hey, I want to

2   see this girl.  We got to make an appointment.

3   They got to contact their attorney.  So they'll

4   call me.

5          ERICA DAVIS:  Okay.

6          RIGDON:  So when we make a mistake, you

7   don't go, well, hey, JJC -- I said you can't do

8   that.  You can't take and pass blame to someone

9   else if we miss (indiscernible).  Well, Huff just

10  has a different mindset.  It's not -- not a bad

11  person.

12         ERICA DAVIS:  And I know she's close to

13  you.

14         MARISSA SANCHEZ:  Uh-huh (affirmative).

15         ERICA DAVIS:  (Indiscernible) I know.

16  You know I know a lot.

17         MARISSA SANCHEZ:  Yeah.

18         ERICA DAVIS:  So no one is going to be

19  happy.

20         RIGDON:  No.  And this is not for

21  everybody.

22         ERICA DAVIS:  It is not for everyone.

23         RIGDON:  This is -- like I said, if

24  you're -- I mean, I make sure we're victim-

25  centered.  If you're not victim-centered, then

Plaintiff 003265

1   this is not --

2            ERICA DAVIS:  Correct.

3            RIGDON:  Because you -- these victims

4   don't have anywhere to go to.

5            ERICA DAVIS:  Correct.

6            RIGDON:  We get to go home to our

7   families.

8            MARISSA SANCHEZ:  Yeah.

9            ERICA DAVIS:  (Indiscernible) scared,

10  walking around.

11           RIGDON:  They feel embarrassed and

12  shunned, and they don't want to tell you.  And

13  then they open up to you --

14           ERICA DAVIS:  I check the site every day

15  to make sure that my guy is still in jail.

16           RIGDON:  So here's this --

17           ERICA DAVIS:  And mine is not even --

18  some of them are worse than mine.

19           MARISSA SANCHEZ:  Yeah.

20           RIGDON:  If a victim opens up and you

21  (indiscernible) forget about it.

22           ERICA DAVIS:  Oh, I was mad just the fact

23  of -- oh, I was mad.

24           RIGDON:  So my deal is, look, we -- blow

25  off this (indiscernible) --

1          ERICA DAVIS:  Yeah.

2          RIGDON:  If they open up, they're willing

3     to come and --

4          ERICA DAVIS:  Yeah.

5          RIGDON:  You tell them they don't matter.

6          ERICA DAVIS:  Correct.

7          RIGDON:  I mean, that's what I'm saying.

8     It's a rough deal.

9          ERICA DAVIS:  Yeah.

10          RIGDON:  It's -- it's different.  I mean

11     --

12          ERICA DAVIS:  Right.

13          RIGDON:  And we're doing something

14     different, so there's bumps in the road because

15     nobody is doing this.

16          ERICA DAVIS:  You know, I only get time

17     like comp to leave.  Do you (indiscernible)?

18          RIGDON:  No.  We use the recommended --

19          ERICA DAVIS:  Okay.

20          RIGDON:  I approve it though.

21          ERICA DAVIS:  Well, what you do is that

22     (indiscernible) transfer (indiscernible) paperwork

23     just in case something happens --

24          MARISSA SANCHEZ:  Uh-huh (affirmative).

25          ERICA DAVIS:  -- and you're like, "I'm

Plaintiff 003267

1   out," it's already approved.

2          MARISSA SANCHEZ:  Okay.

3          ERICA DAVIS:  Does that make sense?

4          MARISSA SANCHEZ:  Uh-huh (affirmative).

5          ERICA DAVIS:  That doesn't mean she's

6   leaving.

7          RIGDON:  Yeah.

8          ERICA DAVIS:  But if I give to you at 2

9   o'clock I need to leave today.  You approve it.

10  She's still here at 3 o'clock because something

11  happened, and she walks out.  She's covered

12  because she had already told you she had to leave

13  at 2:00.

14         RIGDON:  Because she's got

15  (indiscernible).  I mean, I'm not like that.

16         ERICA DAVIS:  Okay.

17         RIGDON:  She's --

18         MARISSA SANCHEZ:  Yeah.  He's a -- I mean

19  --

20         ERICA DAVIS:  (Indiscernible) I don't

21  feel good.  I hear it.

22         MARISSA SANCHEZ:  Yeah.

23         ERICA DAVIS:  Unfortunately, I don't have

24  the same -- I'm very close to -- we are about

25  business.

Plaintiff 003268

```
 1              MARISSA SANCHEZ:  Yes.

 2              ERICA DAVIS:  And we do our job.

 3              MARISSA SANCHEZ:  I mean, that's how it

 4   should be.  It shouldn't be any other way, and --

 5              ERICA DAVIS:  And when we get in

 6   arguments about race relations, it's about the

 7   work.

 8              MARISSA SANCHEZ:  Yeah.

 9              ERICA DAVIS:  Okay.

10              RIGDON:  (Indiscernible)

11              ERICA DAVIS:  I don't know.  He's calling

12   me.  (Indiscernible) Okay.

13              MARISSA SANCHEZ:  Uh-huh (affirmative).

14              RIGDON:  He's probably wondering I'm at

15   because I got you.

16              ERICA DAVIS:  Oh, does he know you were

17   with me?

18              RIGDON:  No.

19              ERICA DAVIS:  (Indiscernible)

20              RIGDON:  I think we got her.

21              ERICA DAVIS:  Oh, we were talking about

22   (indiscernible).  (Indiscernible)

23              (Cross talk)

24              RIGDON:  Right.  He talked on my phone.

25   So what time were (indiscernible)?
```

Plaintiff 003269

1          ERICA DAVIS:  I still don't know because

2    she (indiscernible).

3          Good night.

4          MARISSA SANCHEZ:  (Indiscernible)

5          ERICA DAVIS:  (Indiscernible)

6          UNIDENTIFIED MALE:  Guess who is going in

7    on the street?

8          (END OF AUDIO FILE)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Plaintiff 003270

```
 1              CERTIFICATE OF TRANSCRIPTIONIST

 2          I certify that the foregoing is a true

 3   and accurate transcript of the digital recording

 4   provided to me in this matter.

 5          I do further certify that I am neither

 6   a relative, nor employee, nor attorney of any of

 7   the parties to this action, and that I am not

 8   financially interested in the action.

 9

10

11

12   _____

13          Julie Thompson, CET-1036

14

15

16

17

18

19

20

21

22

23

24

25
```

Plaintiff 003271

Messages - Alan Rosen

Anytime. Text me if you need data or contacts. All these guys have articles on them too. If you need them I'll email to you. Have a good night.

You too.

1/2/20, 5:12 PM

I did talk to Chief and the situation isn't any better. I'm sorry. I'll explain when I can talk to you or Erica. But besides that everything is great. I just came from CAC and PCT 1 is now apart of all these groups for Jimenez Traffickng with the governors office

1/2/20, 7:17 PM

Thank you for speeding up the process to interview her. I've been asking for a week. After outcry's interviews have to happen right away. It's crucial to protecting the victim and getting the predator.



Plaintiff 000783

Plaintiff 002692





Plaintiff 002694

Plaintiff 002696

Plaintiff 002697





Plaintiff 002775





